STATE OF CONNECTICUT *v.* RYAN THOMPSON
(AC 21588)

Schaller, Pellegrino and Flynn, Js.

300

Argued December 6, 2001—officially released April 23, 2002

*Moira L. Buckley*, deputy assistant public defender, for the appellant (defendant).

*Joy K. Fausey*, deputy assistant state's attorney, with whom, on the brief, were *Vincent J. Dooley*, senior assistant state's attorney, and *Roger Caridad*, assistant state's attorney, for the appellee (state).

*Opinion*

FLYNN, J. The defendant, Ryan Thompson, appeals from the judgment of conviction, rendered after a jury trial, of reckless manslaughter in the first degree with a firearm in violation of General Statutes §§ 53a-55 (a) (3) and 53a-55a.[1] On appeal, the defendant claims that (1) he was deprived of a fair trial by prosecutorial misconduct, (2) the trial court improperly allowed witnesses to testify as to the credibility of other witnesses, (3) the trial court improperly admitted the written

---

[1] General Statutes § 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person."

General Statutes § 53a-55a (a) provides in relevant part: "A person is guilty of manslaughter in the first degree with a firearm when he commits manslaughter in the first degree as provided in section 53a-55, and in the commission of such offense he uses, or is armed with and threatens the use of or displays or represents by his words or conduct that he possesses a pistol, revolver, shotgun, machine gun, rifle or other firearm. . . ."

*Whelan*[2] statements of two witnesses and (4) the trial court improperly admitted hearsay testimony. We conclude that prosecutorial misconduct in closing argument so infected the trial with unfairness as to make the resulting conviction a denial of due process and a deprivation of the defendant's right to a fair trial. We further conclude that a witness improperly was permitted to testify as to the credibility of another witness. Accordingly, we reverse the judgment of the trial court and remand the case for a new trial.

The jury reasonably could have found the following facts. On the evening of April 18, 1998, the victim, Robert McCaffery, and his friend, John Jones, attended a party at an apartment in the Moosup section of Plainfield. The two left the apartment at approximately 11 p.m. and climbed onto a nearby garage roof to smoke and to watch an altercation that was taking place in front of the apartment. As the two men were sitting on the roof, Jones heard a "pop." When Jones turned around, McCaffery was lying on his back with blood coming out of the side of his head. McCaffery subsequently died as a result of a gunshot wound. A witness testified to seeing the defendant exit a car just before the shooting, holding what appeared to be a rifle, and run between two houses in the direction of the victim. No eyewitnesses actually saw the defendant shoot the victim.

Two days after the shooting, the defendant was charged with murder in violation of General Statutes § 53a-54a. Following a jury trial, the defendant was found guilty of the lesser included offense of reckless manslaughter in the first degree with a firearm in violation of §§ 53a-55 (a) (3) and 53a-55a. The jury found the defendant not guilty on the charge of murder in

[2] *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).

violation of § 53a-54a and intentional manslaughter in the first degree in violation of § 53a-55a. He was sentenced to twenty-five years in the custody of the commissioner of correction. This appeal followed.

I

First, the defendant claims that the state engaged in prosecutorial misconduct depriving him of a fair trial in violation of the fourteenth amendment to the United States constitution and article first, § 8, of the constitution of Connecticut. We agree.

The defendant failed to preserve his claim at trial and now seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[3] We review the defendant's claim because the record is adequate for review, and his allegation of prosecutorial misconduct in violation of his right to a fair trial is of constitutional magnitude. Furthermore, we conclude that under the circumstances of this case, the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial.

Our standard of review of a claim of prosecutorial misconduct is well established. "Our Supreme Court has previously acknowledged that prosecutorial misconduct can occur in the course of closing argument. . . . It is well settled, however, that a defendant may not prevail under *Golding* . . . unless the prosecutorial impropriety was so pervasive or egregious as to

---

[3] Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

constitute an infringement of the defendant's right to a fair trial." (Internal quotation marks omitted.) *State* v. *Jones*, 65 Conn. App. 649, 656, 783 A.2d 511 (2001). "In determining whether prosecutorial conduct amounts to a denial of due process, we consider whether the conduct was improper, and, if so, we next determine whether the conduct caused substantial prejudice to the defendant. . . . We do not focus alone, however, on the conduct of the prosecutor. The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct." (Citation omitted; internal quotation marks omitted.) *State* v. *Dillard*, 66 Conn. App. 238, 241, 784 A.2d 387, cert. denied, 258 Conn. 943, 786 A.2d 431 (2001); see also *State* v. *Whipper*, 258 Conn. 229, 262–63, 780 A.2d 53 (2001). In deciding whether the claim of misconduct caused the defendant substantial prejudice, we look to whether it so infected the trial with unfairness so as to make the conviction a denial of due process. *Darden* v. *Wainwright*, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986).

Although the defendant identifies several instances of alleged misconduct in support of his claim, we focus our inquiry on the most egregious statements, as they are dispositive of this claim. First, the defendant claims that during closing argument, the prosecutor improperly expressed his personal opinion, appealed to the jury's emotions and impugned the character of witnesses when he referred to three witnesses, Jared Gilkenson, David Stebbins and Brandy Stebbins, friends of the defendant who were in the car with him on the night of the shooting. Both Gilkenson and David Stebbins gave written pretrial statements to the police inculpating the defendant, but at trial both testified that it was not the defendant who shot the victim.

In closing argument, the prosecutor stated: "Don't think for one minute that any of these kids is a stand-up enough guy that he's gonna come in there—in here and take the rap for the other. Just as Gilkenson and Stebbins would give up Ryan to protect themselves, we know Thompson would do the same if the shoe had been on the other foot. Ryan is not gonna risk a lengthy jail term to protect David or Jared. If he was not the shooter and he knew who was, he would have told you that. This is not Camelot, and there is no chivalry here. . . . These kids will protect themselves first. Then, and only then, will they protect each other. That's what happened in this case. While it was Ryan Thompson's finger that pulled the trigger, without David Stebbins and Jared Gilkenson, Rob McCaffery would be alive today. Had either of those individuals been able to put aside their wounded pride, none of us would be in this courtroom today. Mr. Meisler [the defendant's attorney] says nobody else was arrested but Ryan Thompson. None of these other kids have been arrested. The operative word is 'yet.' David Stebbins, Jared Gilkenson and Brandy Stebbins have not yet been arrested. When you read the statements of Jared and David, it is very obvious that they knew exactly what they were saying. Those statements indicate that both Jared and David know that it is not a crime to sit by and watch as Ryan jumped out of the car and shot someone. But all they needed to say was, 'Come on, Ryan. Let's go home. The party's over.' The fact that they didn't do so is reprehensible. The fact that they would come into court and lie to protect him is even more reprehensible. If neither one of those kids had the moral fortitude to prevent Rob McCaffery's death, do you honestly believe for one minute that their character would prevent them from coming into court and lying to protect their friend? . . . On the day following this shooting, Jared Gilkenson and David Stebbins knew that they had taken part

in the killing of another human being. When the police confronted them, they truthfully told the police who amongst them was responsible. Today, they have no conscience. In their twisted world, there is much more shame attached to being a snitch than there is in protecting a killer from justice. And [in] their misguided loyalty to their friend, Ryan Thompson, they have reserved a place in hell for themselves." The prosecutor also stated: "It is only natural that David and Jared would feel guilty about ratting out their friend. However, it's not until April 22nd that either one of these individuals begin to change their stories. It's a very sad commentary on the character [of] David Stebbins and Jared Gilkenson that their misguided sense of loyalty would outweigh the apprehension of a killer. It's even sadder to think that the parents would rather see a killer escape justice than to admit to the world or even to themselves that their children had anything to do with this incident."

"While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or even to suggest an inference from, facts not in evidence, or to present matters which the jury have no right to consider. . . . We have cautioned repeatedly that a prosecutor should avoid arguments which are calculated to influence the passions or prejudices of the jury, or which would have the effect of diverting the jury's attention from their duty to decide the case on the evidence." (Internal quotation marks omitted.) *State* v. *Dillard*, supra, 66 Conn. App. 247.

In the past, we have afforded prosecutors great latitude in "the limits of legitimate argument" and "the zeal of counsel in the heat of argument"; (internal quotation marks omitted) *State* v. *Whipper*, supra, 258 Conn. 252; but it cannot go unbridled. While we have recognized that closing arguments " 'often have a rough and tumble

quality about them' " and that " 'some leeway must be afforded to the advocates' "; *State* v. *Hampton*, 66 Conn. App. 357, 373, 784 A.2d 444, cert. denied, 259 Conn. 901, 789 A.2d 992 (2001); we will not sanction a verbal free-for-all.

We now turn to the first step in our analysis of whether the defendant was deprived of his due process right to a fair trial by first determining whether summation statements made by the prosecution were improper. If they were not improper, there would be no need to address the second stage of analysis concerning whether substantial prejudice resulted to the defendant.

The prosecutor's statements in this case exceeded all bounds of acceptable conduct by indicating that witnesses "have reserved a place in hell for themselves." Hell is defined by the American Heritage Dictionary (2d College Ed. 1982) as: "In many religions, the abode of condemned souls and devils; the place of punishment for the wicked after death." Whether one observes such religion, or not, there is a common understanding that hell refers to a place of eternal damnation. In stating that the defense witnesses would be consigned to hell because of their testimony, the prosecutor impermissibly expressed his own opinion on their credibility in a most inflammatory and vitriolic manner, in a case that depended heavily on circumstantial evidence and the testimony of these witnesses.

"Federal and state courts have universally condemned such religiously charged arguments as confusing, unnecessary, and inflammatory. See *Cunningham* v. *Zant*, 928 F.2d 1006, 1019–20 (11th Cir. 1991) (improper to compare defendant to Judas Iscariot); *United States* v. *Giry*, 818 F.2d 120 [133 (1st Cir.)] (improper to compare defendant's statement to Peter's denial of Christ) [cert. denied, 484 U.S. 855, 108 S. Ct. 162, 98 L. Ed. 2d 116 (1987)]; *Commonwealth* v. *Cham-*

*bers*, [528 Pa. 558, 586–87] 599 A.2d 630 (Pa. 1991) (allusions to Bible in Commonwealth's argument are *per se* reversible) [cert. denied, 504 U.S. 946, 112 S. Ct. 2290, 119 L. Ed. 2d 214 (1992)]." *Bennett* v. *Angelone*, 92 F.3d 1336, 1346 (4th Cir. 1996). "The obvious danger of such a suggestion is that the jury will give less weight to, or perhaps even disregard, the legal instructions given it by the trial judge in favor of the asserted higher law. . . . The Establishment Clause of the First Amendment also requires us to be especially vigilant in guarding against religious argument. When the State invokes Biblical teachings to persuade a jury, there is, at the very least, the appearance of state endorsement of those teachings." (Citations omitted; internal quotation marks omitted.) *Sandoval* v. *Calderon*, 231 F.3d 1140, 1150–51 (9th Cir. 2000).

It is highly improper in a jury trial for a prosecutor to express an opinion suggesting to those jurors who believe in heaven and hell as an article of their religious faith that witnesses' trial testimony should result in the witnesses going to a place of eternal damnation after their own deaths. Regardless of whether the appeal to religious imagery was meant literally, in our pluralistic society there is no place for such religious appeals in a criminal trial. The case must be decided by the evidence or lack of it.

In addition, the statements suggesting that the same witnesses were facing impending arrest for the same incident are inexcusable. There simply was no evidence to warrant that statement. Such a statement coming from a prosecutorial official was likely to sway the jury. We note that not only are these types of statements a violation of a defendant's right to a fair trial, they also violate rule 3.4 (5) of the Rules of Professional Conduct. Rule 3.4 (5) provides that a lawyer will be in violation of the rules if he or she "[i]n trial, allude[s] to any matter that the lawyer does not reasonably believe is relevant

or that will not be supported by admissible evidence, assert[s] personal knowledge of facts in issue except when testifying as a witness, or state[s] a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused . . . ." In criminal cases, our Supreme Court previously has cited with approval the American Bar Association (ABA) standards with respect to the prosecution and defense function, which require that the "prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict." (Internal quotation marks omitted.) *State* v. *Gold*, 180 Conn. 619, 659, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980); ABA Standards for Criminal Justice (3d Ed. 1993) § 3-5.8.[4]

The defendant also claims that the prosecutor improperly gave his personal opinion as to the credibility of a witness. During closing argument, the prosecutor stated: "Mr. Meisler tells you, you can't believe Robert Latour because his testimony is inconsistent. . . . He cannot give you a reason because Robert Latour was telling the truth. He told the truth in April when the police first spoke with him. He told the truth

---

[4] ABA Standards for Criminal Justice § 3-5.8 provides: "(a) In closing argument to the jury, the prosecutor may argue all reasonable inferences from evidence in the record. The prosecutor should not intentionally misstate the evidence or mislead the jury as to the inferences it may draw.

"(b) The prosecutor should not express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

"(c) The prosecutor should not make arguments calculated to appeal to the prejudices of the jury.

"(d) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence."

when he testified at the probable cause hearing, and he told the truth when he testified before you. When he told you it was Ryan Thompson that got out of the car carrying a rifle, he was telling you the truth. We also know that Ron Harding and Robert Latour were telling the truth because David Stebbins and Jared Gilkenson confirm everything they say."

There were six separate occasions on which the prosecutor indicated to the jury that the witness, Latour, told the truth. These were sufficiently frequent and uninvited by the defense, which permissibly pointed out inconsistencies in Latour's statements. No curative instruction was given. Lacking any eyewitnesses who actually saw the shooting, the prosecution's case depended on inferences to be drawn from conflicting testimony. "The prosecutor may not express his own opinion, either directly or indirectly, as to the credibility of witnesses. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony. . . . These expressions of opinion are particularly difficult for the jury to ignore because of the special position held by the prosecutor. . . . The jury is aware that he has prepared and presented the case and consequently, may have access to matters not in evidence . . . which the jury may infer to have precipitated the personal opinions." (Citations omitted; internal quotation marks omitted.) *State* v. *Williams*, 204 Conn. 523, 541–44, 529 A.2d 653 (1987). "Improper comments on the part of the prosecutor regarding the veracity of one party over the other can easily skew a proper jury deliberation." *State* v. *Alexander*, 254 Conn. 290, 305, 755 A.2d 868 (2000).

Having concluded that the prosecutor's conduct was improper, we next determine whether the conduct caused substantial prejudice to the defendant. "To make this determination, we must focus on several factors: (1) the extent to which the misconduct was invited

by defense conduct or argument; (2) the severity of the conduct; (3) the frequency of the conduct; (4) the centrality of the misconduct to the critical issues of the case; (5) the strength of the curative instructions adopted; and (6) the strength of the state's case." (Internal quotation marks omitted.) *State v. Dillard*, supra, 66 Conn. App. 241.

In analyzing the statements made and the effect they had on the defendant's right to a fair trial, we first examine the extent to which the conduct was invited by the defense conduct or argument. A careful examination of defense counsel's summation does not reveal any personal vouchers from him that particular witnesses told the truth or lied, nor were there any appeals to religious dogma or belief. Nor did he make ad hominem attacks against the character of state witnesses. Instead, defense counsel focused extensively on contradictions in witnesses' testimony, either internally or in contrast to other witnesses' versions of events. For example, he pointed out that the state's principal witness, Latour, in a first excited utterance, had blamed another person, David Stebbins, for the killing. He also pointed to the lack of certain evidence, e.g., the lack of any gun used in the crime. Defense counsel's final argument is devoid of any improper interjection of religious appeals to the jury. None of his comments could be said to have invited repeated statements from the prosecutor that witnesses for the state were telling the truth, implying that defense witnesses would be arrested[5] and interjecting an opinion that by their testi-

---

[5] The prosecutor first brought up the pretrial arrest of the witnesses, Gilkenson and David Stebbins, in his closing argument, which was delivered before that of defense counsel. The prosecutor argued that the witnesses had given their initial statements to avoid arrest themselves when he stated: "But take a look at what's going on inside the minds of [Stebbins] and [Gilkenson]. They knew that they were in big trouble when the police came back. Witnesses at the crime scene had implicated one of the people in Brandy's car. When these officers are talking to them, they don't know whether it's one witness or thirty witnesses. They were scared. They knew they had been implicated. They knew they were involved. . . . They had

mony certain witnesses were liars from a twisted world and had reserved a place in hell for themselves.

Second, we examine the severity of the misconduct. We conclude that the prosecutor's conduct was severe and further magnified by the fact that it was made during rebuttal, which left the defense counsel no chance to respond. Severe, as used in this context, is defined as "strongly critical and condemnatory"; Merriam-Webster's Collegiate Dictionary (10th Ed. 1993); and we can think of nothing more condemnatory than stating that witnesses have "reserved a place in hell for themselves." The prosecutor also told the jury that without David Stebbins' and Jared Gilkenson's conduct, "Rob McCaffery would be alive today." He described them as having "no conscience" or "moral fortitude" and as living in a "twisted world," and he stated that they had lied and were "lying to protect their friend." We therefore conclude that the severity prong has been satisfied.

Third, the frequency prong also is satisfied. There were multiple egregious statements in the rebuttal, some of which were repeated several times.

Fourth, the offending statements were central to critical credibility issues in the case. Prosecution witness Latour had first made an excited utterance stating that David Stebbins had shot the victim. At trial, Latour gave testimony that he saw the defendant exit the car and run between two buildings with what appeared to be a rifle in his hands just before Latour heard a popping

a choice. They were either going to be witnesses or they were going to be defendants. When they told the police that [the defendant] was the shooter, they are protecting themselves. Make no doubt about that."

Defense counsel, in his summation, responded that they had not been charged when he stated: "I haven't—there's no evidence in this case [that Gilkenson and Stebbins] have been charged with anything." In our opinion, given this context, defense counsel could not be said to have invited the prosecutor's statement implying that these two witnesses would be arrested.

sound. Latour's first utterance and the inference to be drawn from his trial testimony were in conflict. Additionally, there were conflicts between second pretrial statements given by David Stebbins and Gilkenson and their subsequent trial testimony. The credibility of these witnesses was central to the prosecution and defense of this case. Since no person testified that they saw the defendant shoot the victim, a conviction depended on whether circumstantial evidence could be marshaled to prove beyond a reasonable doubt that the defendant fired the rifle that killed the victim.

Fifth, no curative instructions were sought or given at the time of the improper remarks. We are, therefore, not convinced that the court's later general instructions to the jury to the effect that argument of counsel was not evidence was sufficient to cure the damage.

Finally, the state's case against the defendant was based on circumstantial evidence. To find the defendant guilty, the jury had to find that the defendant was in the car with the rifle, exited the car with the rifle and ran between two buildings, that a shot rang out that killed the victim and that the defendant must have fired that shot. Given the lack of any direct eyewitnesses to the shooting and the differing versions of the events of that night, the evidence of guilt was not so overwhelmingly strong that the misconduct could not have improperly influenced the jury. See *State* v. *Alexander*, 50 Conn. App. 242, 259–60, 718 A.2d 66 (1998), rev'd in part on other grounds, 254 Conn. 290, 755 A.2d 868 (2000).

Under the circumstances of this case, we conclude that the frequency and gross impropriety of the prosecutor's comments[6] caused the defendant substantial preju-

---

[6] The defendant also identifies the following comments as prosecutorial misconduct:

"While Mrs. Gilkenson got up on the [witness] stand and protected her son with the same unthinking veracity as a tiger is protecting her cubs, for all machination, she was unable to keep the lies straight.

\* \* \*

dice and infringed on his right to a fair trial. "In Connecticut the appropriate remedy for an unfair trial due to prosecutorial misconduct is to vacate the judgment of conviction and to grant a new trial." *State* v. *Ubaldi*, 190 Conn. 559, 570, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983).

## II

The defendant next claims that the court improperly allowed a state police sergeant to testify as to the credibility of another state's witness and improperly allowed a witness for the state to testify as to the credibility of a key defense witness.

## A

The defendant claims that the court improperly permitted a witness to testify as to the credibility of another witness. We agree.

"As jurors, it is your job to examine the circumstances surrounding the taking of these statements. When you do so, please use your common sense. When these statements were taken, the state police were trying to solve a homicide. They have a dead boy on their hands. They want to catch the person who is responsible for doing this . . . The detectives of the major crime squad, just like the people of the state of Connecticut, the same people that pay their salaries, want to see that justice is served. They want to see that the person that killed Rob McCaffery is brought to justice.

* * *

"Erin Whalen also testified that during the evening of the eighteenth, David was bragging about having brought weapons to the party. 'I don't know why these guys are picking on me, I have guns in the car.' . . . We know that the shooter came from Brandy Stebbins' car because of David Stebbins and what he told Officer [Jeff] Berard [of the Plainfield police department] and Erin Whalen. During the evening, David Stebbins was bragging about having weapons in the car.

* * *

"The earliest anyone knows that David or Jared is saying anything different is April 22nd, four days after the murder of Rob McCaffery. By then, the Gilkensons, Stebbinses and Thompsons have circled their wagons and there will be no more cooperation in this investigation. . . . They have now had four days to put as much distance between that murder weapon and them as possible."

Sergeant John Turner of the Connecticut state police was called by the defense to testify about the murder investigation.[7] During cross-examination, Turner testified as to the credibility of a key state's witness, Latour. During cross-examination, the following colloquy occurred:

"[Prosecutor]: Sergeant, how would you describe Robert Latour as a witness?

"[Defense Counsel]: Excuse me?

"The Court: Do you have an objection?

"[Defense Counsel]: He didn't see him testify. How can he describe him as a witness?

"[Prosecutor]: I'm talking about the investigation. . . . As far as your investigation of this incident goes, would you—how would you characterize Robert Latour?

"[Witness]: I would characterize him as reliable and consistent.

"[Defense Counsel]: I move to strike that, Your Honor. That—the—that's a conclusory opinion, 'reliable and consistent.' It has nothing to do with his observations of the witness. It's his analysis of what he feels the witness' statements are.

"The Court: Well, it's responsive to the question that was asked. I didn't hear an objection. I was sort of expecting one and I didn't get one, and so I think it's too late at this point. But it was responsive to the way the question was asked to him.

---

[7] Both the defendant and the state discuss in their briefs the issue of whether Turner was an expert witness. The defendant conceded at oral argument before this court, however, that the trial court never qualified Turner as an expert witness.

"[Defense Counsel]: I would move to strike it then, Your Honor. As it's not a proper opinion for this witness to give.

"The Court: Well, it's too late."

To analyze this claim, we must first set forth our standard of review. In Connecticut, "[w]e have followed the rule which permits character or disposition to be proved by the opinion evidence of those who have been shown to have had an opportunity to form, and who have formed, an opinion as to the character of the [subject] with respect to the trait or traits in issue. . . . Whether a witness has had sufficient contact with a person to be qualified to testify as to a particular character trait is a matter peculiarly within the discretion of the trial court and its ruling will be disturbed only in a clear case of abuse or of some error in law." (Citations omitted; internal quotation marks omitted.) *State* v. *George*, 194 Conn. 361, 368–69, 481 A.2d 1068 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 963, 83 L. Ed. 2d 968 (1985). In addition to establishing that the court's ruling was an abuse of discretion, the defendant bears the burden of demonstrating harm because the claimed evidentiary impropriety is not constitutional in nature. *State* v. *Grenier*, 257 Conn. 797, 806–807, 778 A.2d 159 (2001).[8]

---

[8] In *State* v. *Grenier*, supra, 257 Conn. 806–807, our Supreme Court stated: "As we recently have noted, we have not been fully consistent in our articulation of the standard for establishing harm. *State* v. *Shabazz*, 246 Conn. 746, 759, 719 A.2d 440 (1998), cert. denied, 525 U.S. 1179, 119 S. Ct. 1116, 143 L. Ed. 2d 111 (1999). One line of cases states that the defendant must establish that it is more probable than not that the erroneous action of the court affected the result. . . . [E.g.] *State* v. *McIntyre*, 242 Conn. 318, 329, 699 A.2d 911 (1997); *State* v. *Wilkes*, 236 Conn. 176, 188, 671 A.2d 1296 (1996) . . . . A second line of cases indicates that the defendant must show that the prejudice resulting from the impropriety was so substantial as to undermine confidence in the fairness of the verdict. See, e.g., *State* v. *Askew*, 245 Conn. 351, 371–72, 716 A.2d 36 (1998). . . . *State* v. *Marshall*, [246 Conn. 799, 812, 717 A.2d 1224 (1998)]. For purposes of the present case, we need not choose between the two formulations or determine whether there is any functional difference between them because we conclude that

It is well settled that "[t]he determination of the credibility of a witness is solely the function of the jury. . . . It is the trier of fact which determines the credibility of witnesses and the weight to be accorded their testimony. . . . [W]itnesses cannot be permitted to invade the province of the jury by testifying as to the credibility of a particular witness or the truthfulness of a particular witness' claims." (Citations omitted; internal quotation marks omitted.) *State* v. *Butler*, 36 Conn. App. 525, 530, 651 A.2d 1306 (1995).

In this case, Latour's credibility and testimony were pivotal to the state's case. Although there were no eyewitnesses to the shooting, Latour's testimony was the strongest evidence inculpating the defendant. Latour testified that on the night of the murder he went outside of the apartment to break up a fight. He told a group of individuals, including the defendant, to leave the party. As the group was getting into a car to leave, one of the individuals pulled a rifle from the car and threatened Latour. The individual then entered the car and it proceeded down the street. Latour testified that the car stopped and he saw the defendant exit the car and run between two houses in the vicinity of the victim with what looked like a rifle in his hand. About a minute later, Latour heard a "pop" and then screaming from the roof where the victim was located.

Turner testified that he never spoke to Latour and that his only "contact" with him was through speaking with other officers and reading Latour's statements. The state claims that the question posed to Turner and his response related only to Latour's reliability during the course of the investigation and not the credibility of his trial testimony. Although Turner's testimony was not an express statement of Latour's truthfulness as a

the defendant has satisfied his burden of proving harm under either formulation of the standard. See id." (Internal quotation marks omitted.)

witness, such testimony had the same substantive import and could be perceived as a conclusive opinion that Latour had testified truthfully. See *State* v. *Grenier*, supra, 257 Conn. 806. The danger of admitting opinion testimony of this type is evident, and the fact that the testimony was elicited from an officer of the law, coupled with the importance of Latour's credibility, renders the probability of its improper effect on the jury and of consequent prejudice to the defendant particularly apparent.

We conclude, therefore, that the court abused its discretion in admitting Turner's testimony and that the defendant has satisfied his burden of proving harm under either of the formulations of the standard for establishing harm. See id.

Although we remand this case for a new trial, we will address the defendant's remaining claims because these issues may arise in the new trial.

B

The defendant next claims that the court improperly permitted a state's witness to testify as to the reputation for truthfulness of Gilkenson, a key defense witness. We disagree.

In its case-in-chief, the state called Bernard Dennler as a witness. Dennler was one of two teachers at an alternative high school attended by both the defendant and Gilkenson. Total enrollment in the program was limited to sixteen to eighteen students. The students and teachers spend the entire school day, from 8 a.m. to 2 p.m., in the same room. Dennler knew Gilkenson in this school setting, on a daily basis, for nine months prior to the shooting that occurred in April, 1998, but had no direct contact with Gilkenson from that time until his testimony in December, 1999.

During direct examination of Dennler, the prosecutor asked him about his opinion of Gilkenson's reputation

for truthfulness.[9] Defense counsel objected on the basis that the state had not laid a proper foundation for the testimony because there was no evidence that Dennler had sufficient contact with Gilkenson to form an opinion. At that point, the jury was excused to allow the state to voir dire Dennler to determine if there was a proper foundation. Outside of the presence of the jury, Dennler testified that he knew Gilkenson in the school setting for nine months and following the shooting he had conversations with students in his classroom regarding Gilkenson. Dennler testified that the last conversation he had with someone regarding Gilkenson was approximately three weeks prior to commencement of trial. The court determined that a proper foundation existed for Dennler to testify as to his opinion of Gilkenson's reputation for truthfulness. In the presence of the jury, the following colloquy occurred:

"[Prosecutor]: Mr. Dennler, do you have an opinion as to Mr. Gilkenson's reputation for truthfulness in the community?

"[Witness]: Yeah, he tends not to be truthful.

"The Court: Well, the question is just yes or no.

"[Witness]: Yes.

"[Prosecutor]: And what is that opinion, sir.

"[Witness]: That he's one not to be trusted and for the most part doesn't tell the truth.

\* \* \*

"[Prosecutor]: What is your personal opinion as to the reputation of Mr. Gilkenson in regards to truthfulness?

---

[9] During direct examination of Dennler, the following colloquy occurred:

"[Prosecutor]: Now, you have known Mr. Gilkenson for approximately most of the school year at that point?

"[Witness]: Correct.

"[Prosecutor]: And do you have an opinion as to Mr. Gilkenson's reputation for truthfulness?

"[Defense Counsel]: Objection, Your Honor."

"[Witness]: He's not truthful.

"[Prosecutor]: And—

"[Witness]: Ever. . . . He's not truthful ever."

Under the circumstances of this case, we conclude that the court did not abuse its discretion by allowing Dennler to give his opinion regarding Gilkenson's truthfulness. The teacher-student relationship is a particularly close one consisting of daily interaction for hours at a time. Such interaction with a person in a small community such as a school makes a teacher particularly qualified to give an opinion regarding a student's reputation. Although Dennler had no personal contact with Gilkenson for approximately one and one-half years before trial, he spoke with other students in the school about Gilkenson as recently as three weeks prior to trial. In addition, there was other testimony regarding Gilkenson's credibility, including that of his father, who testified that he lied to him and teachers in the past. Therefore, any impropriety in the admission of Dennler's testimony was harmless.

### III

The defendant next claims that the court improperly admitted the written statements of two witnesses for substantive purposes. We disagree and conclude that our Supreme Court's decision in *State* v. *Mukhtaar*, 253 Conn. 280, 305–306, 750 A.2d 1059 (2000), is dispositive of this claim. The following facts are relevant to our resolution of this claim.

During the murder investigation, David Stebbins and Gilkenson, friends of the defendant who had gone to the party with him on the night of the shooting, gave written statements to the police that inculpated the defendant. At trial, both Stebbins' and Gilkenson's testimony conflicted with their written statements. In Gilkenson's statement to the police, he stated that he went

to the party with the defendant, David Stebbins, Stebbins' sister and another friend. As the group was leaving the party, Gilkenson saw the defendant running toward the car with a rifle in his right hand. The defendant got into the car with the rifle and said "something about that he just shot someone let's get the hell out of here."

In his statement, Stebbins said that prior to leaving for the party "[the defendant] had stuffed down his pants leg a .22 caliber rifle." When they arrived at the party, the defendant left the rifle in the car. Stebbins said that later that night, as the group was leaving the party, the defendant got out of the car with the rifle and ran between a couple of garages that were near the house where the party was taking place. He stated that approximately fifteen seconds later, "we all heard a pop." He then saw the defendant run back toward the car, get in with the rifle in his hands and state: "Let's get out of here. I think I hit somebody."

At trial, however, both Stebbins and Gilkenson testified that they never saw the defendant with a rifle on the night of the party. The state sought to have both statements admitted for substantive purposes as inconsistent statements pursuant to *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). The defendant objected on the ground that the state had not established a proper foundation for the admission of the statements because there was no testimony about the circumstances surrounding how and why the statements were taken by the police.[10] Specifically, the defen-

[10] With regard to the admission of Gilkenson's statement, the following colloquy occurred:

"[Prosecutor]: I would offer that under *State* v. *Whelan* [supra, 200 Conn. 753,] as an inconsistent statement, Your Honor.

"[Defense Counsel]: Your Honor, I don't think that it's admissible for substantive purposes under *Whelan*. It's admissible as an inconsistent statement at this point, and I don't think we've met the test of *Whelan* that it was given under circumstances which satisfy its authenticity.

"The Court: I will admit it as a full exhibit. It does appear to satisfy the

dant claims that both witnesses were coerced into making the pretrial statements to the police. "Under *State* v. *Whelan,* supra, 200 Conn. 753, a prior inconsistent statement may be admitted into evidence for substantive purposes where (1) the statement is in writing, (2) the statement is signed by the declarant, (3) the declarant has personal knowledge of the facts contained therein and (4) the declarant testifies at trial and is subject to cross-examination. Our Supreme Court recently reiterated . . . that the admissibility of a prior inconsistent statement [for substantive purposes] depends on the satisfaction of these four requirements. A *Whelan* claim is evidentiary in nature and, accordingly, the defendant bears the burden of establishing that the trial court's erroneous ruling was harmful to him in that it probably affected the outcome of the trial. . . . The admissibility of a prior inconsistent statement

---

*Whelan* criteria. . . . [It] appears to be based on personal observations. It was indicated that he did sign it. It's a written statement. It is, in some respects, inconsistent in effect with the testimony that he has given and other statements, and so I'm admitting it under the *Whelan* doctrine."

With regard to the admission of Stebbins' statement, the following colloquy occurred:

"[Prosecutor]: I would offer that under *State* v. *Whelan* [supra, 200 Conn. 753] as a prior inconsistent statement, Your Honor.

"[Defense Counsel]: This is being offered as a *Whelan* statement for the substance or is it being offered as a prior inconsistent statement?

"[Prosecutor]: Being offered under *Whelan*, substantive purposes as a prior inconsistent statement.

"[Defense Counsel]: Your Honor, I don't think that it meets the foundation requirements for *Whelan* and would object if it's being offered on that basis.

"The Court: What do you claim is lacking in the foundation?

"[Defense Counsel]: I claim what's lacking in the foundation is any testimony about the circumstances surrounding why and how it was taken by the police.

"[Prosecutor]: That goes to the weight, Your Honor.

"The Court: Yes, I think that's correct. It goes to weight, not admissibility. The witness has testified today in a manner which is inconsistent with what he apparently has said in a statement which he signed, which is in writing, which indicates that it was based on personal knowledge and he's present in court for cross-examination. So, I think it does come under the *Whelan* circumstances. It will be admitted as a full exhibit."

under *Whelan* is a matter within the wide discretion of the trial court. . . . On appeal, the exercise of that discretion will not be disturbed except on a showing that it has been abused." (Citations omitted; internal quotation marks omitted.) *State* v. *Sotomayor*, 61 Conn. App. 364, 374–75, 765 A.2d 1, cert. granted on other grounds, 255 Conn. 952, 770 A.2d 32 (2001).

In *Mukhtaar*, our Supreme Court stated: "[O]nce the proponent of a prior inconsistent statement has established that the statement satisfies the requirements of *Whelan*, that statement, like statements satisfying the requirements of other hearsay exceptions, is presumptively admissible. Of course, a prior inconsistent statement that fulfills the *Whelan* requirements may have been made under circumstances so unduly coercive or extreme as to grievously undermine the reliability generally inherent in such a statement, so as to render it, in effect, not that of the witness. In such circumstances, the trial court must act as a gatekeeper to ensure that the statement does not go to the jury for substantive purposes. We emphasize, however, that the linchpin of admissibility is reliability: the statement may be excluded as substantive evidence only if the trial court is persuaded, in light of the circumstances under which the statement was made, that the statement is so untrustworthy that its admission into evidence would subvert the fairness of the fact-finding process. In the absence of such a showing by the party seeking to exclude a statement that meets the *Whelan* criteria, the statement is admissible as substantive evidence; like all other evidence, its credibility is grist for the cross-examination mill. Thus, because the requirements that we established in *Whelan* provide a significant assurance of reliability, it will be the highly unusual case in which a statement that meets the *Whelan* requirements nevertheless must be kept from the jury." *State* v. *Mukhtaar*, supra, 253 Conn. 306–307.

In this case, the defendant does not challenge the court's finding that these statements satisfied the *Whelan* requirements. Accordingly, the state was not required to make a showing of reliability beyond satisfying the criteria of *Whelan* to secure proper admission of the statements. During cross-examination, the witnesses testified that the statements they gave to the police were given under coercive circumstances. Under the circumstances of this case, we conclude that the court did not abuse its discretion in admitting the statements, and the testimony elicited on cross-examination went to the weight of the evidence and not its admissibility.

## IV

The defendant finally challenges the court's admission of certain prior consistent and inconsistent hearsay statements.

## A

The defendant claims that the court improperly admitted hearsay testimony as a prior consistent statement. This claim has no merit.

During the defendant's case-in-chief, Paul Benoit testified that shortly after the shooting, Latour told him: "I just saw Stebbins shoot someone." That statement conflicted with Latour's testimony that he saw the defendant with the rifle. Outside the presence of the jury, the state offered the testimony of Carly Armstrong to rehabilitate the testimony of Latour. The court admitted the testimony, stating: "So this is fairly contemporaneous with that other statement, and, therefore, I think it is admissible as an exception to the hearsay [rule] as a prior consistent statement because of the proximity. It doesn't have to be exactly the inconsistent statement followed by the consistent statement. They have to be

contemporaneous, at around the same time. And so I'm going to allow it in."

On appeal, the defendant asks this court to require that for extrinsic evidence of a prior consistent statement to be admissible, a foundation must be set in which the declarant first testifies that he or she made the consistent statement. The defendant cites no precedent for this position and, therefore, we conclude that the court did not abuse its discretion in allowing Armstrong's testimony. Furthermore, another witness testified that Latour told him that the defendant was the shooter and, therefore, Armstrong's testimony was merely cumulative and any impropriety in allowing the testimony was harmless.

B

The defendant also claims that the court improperly allowed the state to introduce hearsay testimony under the guise of a prior inconsistent statement. We disagree.

During trial, David Stebbins and Gilkenson both testified that they did not see a gun in the car that the defendant was a passenger in on the night of the shooting. The state called Erin Whalen, who was at the party that night, to testify. When Erin Whalen was asked about a conversation with Stebbins, defense counsel objected and the jury was excused so that the state could make an offer of proof. The prosecutor informed the court that he expected the witness to testify that Stebbins had told her that there were firearms in the car. Since both Stebbins and Gilkenson testified that there were no firearms in the car that night, Erin Whalen's testimony would go to their credibility. Defense counsel argued that Erin Whalen's testimony was an attempt by the state to impeach the credibility of Stebbins and Gilkenson on a collateral matter. The court overruled the objection agreeing that the testimony was not on a collateral matter and that it could be used to impeach

their credibility. In the presence of the jury, the following colloquy occurred:

"[Prosecutor]: On the way to David's uncle's house, did you have any conversations?

"[Witness]: Yes.

\* \* \*

"[Prosecutor]: And what was he saying?

"[Witness]: That if anyone were to mess with him that he had three guns in the trunk of his sister's car.

"[Prosecutor]: And who was present—was Mr. Gilkenson present when that conversation—

"[Witness]: Yes.

\* \* \*

"The Court: Okay. All right. I also want to take this opportunity to caution the jury that the statement of this witness concerning Mr. Stebbins' statement with regard to weapons being in the—Brandy Stebbins' vehicle is being introduced, even though it is an out-of-court statement, it's being introduced not for your purposes to determine directly whether weapons were in the car, but to—as it bears on the credibility of Mr. David Stebbins and Mr. Gilkenson in their testimony denying that there were weapons in the car or they saw any weapons, and only for that purpose."

On appeal, the defendant claims that the state's motivation for introducing the testimony was for the jury to consider it as substantive evidence that there were guns in the car on the night of the shooting. In support of this argument, the defendant relies, in large part, on a misapplication of our Supreme Court's decision in *State* v. *Graham*, 200 Conn. 9, 509 A.2d 493 (1986). In *Graham* our Supreme Court held that *"the credibility of a witness may be impeached by the party calling*

[*him or*] *her* without a showing of surprise, hostility or adversity. A party may impeach his own witness in the same manner as an opposing party's witness and may demonstrate the witness' bias or bad character for veracity and may impeach the witness using prior inconsistent statements." (Emphasis added.) Id., 17. Subsequently, our Supreme Court established a two-pronged test for the application of the principles adopted in *Graham.* "The introduction of the [prior inconsistent] statement is improper . . . where the primary purpose of calling the witness is to impeach him and the state's attorney introduces the prior inconsistent statement in hope that the jury will use it substantively." (Internal quotation marks omitted.) *State* v. *Williams*, supra, 204 Conn. 531.

In this case, the state was not impeaching the credibility of its own witness; rather it was using the testimony of the witness to impeach the credibility of other witnesses. Although this case does not fall within the confines of the rule enunciated in *Graham*, we acknowledge that this does "not mean to intimate that a state's attorney enjoys unfettered discretion in calling a witness and impeaching [his] credibility by use of inconsistent statements. The prosecution may not use a prior inconsistent statement under the guise of impeachment for the primary purpose of placing before the jury evidence which is admissible only for credibility purposes in hope that the jury will use it substantively." (Internal quotation marks omitted.) Id., 530.

In furtherance of his claim, the defendant asserts that the indication of the state's intent to use the testimony as substantive evidence was the reference to Erin Whalen's testimony in closing argument. The defendant's assertion that the reference to Erin Whalen's testimony in the state's closing argument was improper is a claim separate and distinct from the issue of whether the testimony was properly admitted. The

state's use of Erin Whalen's testimony in its closing argument followed the admission of the testimony and had no effect on the court's decision. At the time the court admitted the testimony, defense counsel's objection was that it was an attempt to impeach Gilkenson and David Stebbins on collateral matters, not that the state was trying to use the testimony as substantive evidence. In addition, we note that the defendant did not object on this basis during the state's closing argument. "This sends a powerful signal that he did not hear the argument as an attempt by the state to induce the jury to use [Whalen's] prior statements substantively." Id., 533.

We conclude that the trial court did not abuse its discretion in admitting the testimony for a limited purpose, and any harm that might have resulted was purged by the court's limiting instruction to the jury.

The judgment is reversed and the case is remanded for a new trial on the charge of reckless manslaughter in the first degree.

In this opinion PELLEGRINO, J., concurred.

SCHALLER, J., concurring. I agree that the judgment must be reversed and the case remanded for a new trial because the defendant, Ryan Thompson, was deprived of a fair trial by reason of prosecutorial misconduct. Resolution of that issue is all that is necessary for a disposition of this case. See *State* v. *Ubaldi*, 190 Conn. 559, 570, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983). When an issue is dispositive, we customarily address other issues raised on appeal only when we reasonably conclude that they are likely to arise during the new trial. See *State* v. *Alexander*, 50 Conn. App. 242, 246, 718 A.2d 66 (1998), rev'd in part on other grounds, 254 Conn. 290, 755 A.2d 868 (2000); *State* v. *Norwood*, 47 Conn. App. 586, 590, 707 A.2d 31 (1998). Although I do not disagree with the majority's analysis of those issues, I cannot conclude

that they are *likely* to arise in the course of the new trial, in accordance with our pertinent case law. Indeed, the majority did not address that question with respect to the defendant's second claim on appeal. With respect to the remaining claims, the majority concluded only that they "*may* arise" in the new trial. (Emphasis added). See majority opinion, part II A.

"Courts sit to determine causes and to enforce their determination. . . . It is not our function to render opinions which are simply advisory." (Citation omitted; internal quotation marks omitted.) *Pellegrino* v. *O'Neill*, 193 Conn. 670, 683, 480 A.2d 476, cert. denied, 469 U.S. 875, 105 S. Ct. 236, 83 L. Ed. 2d 176 (1984).[1] Although it often may seem desirable to offer guidance on a variety of issues to the trial court when we conclude that a new trial is necessary, we should not speculate about what issues may arise in a new proceeding. Whether an issue is likely to arise in a new proceeding is a question this court decides on the facts of each case. To decide issues unnecessarily, however, results in this court's formulating resolutions and principles that may well not enter into the determination of a case, but may, instead, be academic; adding to the body of general decisions that can obscure rather than clarify the law. That particularly is the case here, where the trial court acted properly, as the majority concludes with respect to the claims addressed in parts II B, III and IV of its opinion. For that reason, I respectfully concur in the result reached by the majority.

---

[1] Cf. *Shays* v. *Local Grievance Committee*, 197 Conn. 566, 571, 499 A.2d 1158 (1985) (discussing mootness and noting the well established proposition that " '[i]n the absence of an actual and existing controversy for us to adjudicate in any sense of the term, the courts of this state may not be used as a vehicle to obtain judicial opinions upon points of law . . . and where the question presented is purely academic, we must refuse to entertain the appeal' " [citation omitted]).