## STATE OF CONNECTICUT *v*. DAVID GRENIER
## (SC 16248)

Norcott, Katz, Palmer, Sullivan and Dunnell, Js.

Argued January 18—officially released September 4, 2001

*Moira L. Buckley*, deputy assistant public defender, for the appellant (defendant).

*Lawrence J. Tytla*, senior assistant state's attorney, with whom, on the brief, were *Kevin Kane*, state's attorney, and *John P. Gravalec-Pannone*, senior assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. A jury found the defendant, David Grenier, guilty of sexual assault in the first degree in violation of General Statutes (Rev. to 1993) § 53a-70 (a) (2)[1] and risk of injury to a child in violation of General Statutes (Rev. to 1993) § 53-21.[2] The trial court rendered judgment in accordance with the jury's guilty verdict, from which the defendant appealed to the Appellate Court. The Appellate Court affirmed the trial court's judgment. *State* v. *Grenier*, 55 Conn. App. 630, 655, 739 A.2d 751 (1999). We granted the defendant's petition for certification to appeal, limited to the following issue: "Whether the Appellate Court incorrectly determined that the

---

[1] General Statutes (Rev. to 1993) § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person . . . (2) engages in sexual intercourse with a person under thirteen years of age . . . ."

[2] General Statutes (Rev. to 1993) § 53-21 provides: "Any person who wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that its life or limb is endangered, or its health is likely to be injured, or its morals likely to be impaired, or does any act likely to impair the health or morals of any such child, shall be fined not more than five hundred dollars or imprisoned not more than ten years or both."

improperly admitted expert testimony regarding the ultimate issue in the case was harmless error?" *State v. Grenier*, 252 Conn. 931, 746 A.2d 794 (2000). We conclude that the improperly admitted testimony was not harmless and, consequently, the defendant is entitled to a new trial. We, therefore, reverse the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the facts that the jury reasonably could have found. "The victim, S, was born on November 11, 1989. In 1993, the defendant lived with his mother, who is S's maternal grandmother. The defendant is the half-brother of S's mother. Also living with the defendant and his mother were S's great-grandmother and great-aunt. The defendant occupied two rooms in the house, one upstairs and one downstairs. In a downstairs room, known as 'David's room,' the defendant kept expensive electronic equipment and did not permit S's cousins of similar age in the room. S, however, was allowed into the defendant's room.

"S and her mother visited the house at least every other weekend. During [those] visits, S's mother sometimes ran errands and left S at the house while the defendant was home. During a visit in the summer of 1993, S disclosed to her grandmother that the defendant had licked her vagina.[3] S's grandmother repeated to her daughter, S's mother, what S had told her. Later that day, when S's father came home, S's mother told him about S's disclosure. Sometime thereafter, S disclosed to both of her parents that [the defendant] had sexually assaulted her in his room.

---

[3] "The phrase used by S to describe the incident was that the defendant had licked her on her 'heinie.' S's mother testified that S would sometimes refer to her vagina as her heinie. At trial, S testified that '[the defendant] touched [her private area] with his hands and his tongue.' " *State v. Grenier*, supra, 55 Conn. App. 632 n.3.

"Rather than call the police, S's parents wanted to handle the incident as a family matter. A family meeting was held in September, 1993, at the home of S's parents at which the defendant, the defendant's brother and S's grandmother were present. During the meeting, S's father accused the defendant of sexually assaulting [S]. The defendant was upset about the allegations but offered to pay for S's counseling if she needed any.

"Following the summer of 1993, S's parents observed S acting in a sexually inappropriate manner for her age. In first grade, S began to see a counselor because of her behavior in school, where she would act inappropriately and talk about having sex. On February 6, 1996, S was evaluated [by Kimberly Herwerth, a certified child counselor with] Northeastern Connecticut Sexual Assault Crisis Services in Willimantic, [whom] she told . . . that the defendant had had sex with her. Herwerth contacted the department of children and families and referred S to Deborah McGeehan, a clinical psychologist, for play therapy. During one of their play sessions, S told McGeehan that the defendant had sexually abused her. McGeehan testified that S's behavior during [the] play sessions was consistent with that of a child who had been sexually abused.

"At trial, the defendant testified that he had been falsely accused. He testified that in the beginning of 1993, S had a tantrum in front of him after he repeatedly told her to stop poking him with a toy. The defendant also testified that in early 1993, he and S's father had a serious work-related argument that resulted in the defendant leaving his employment with S's father. The defendant maintained that he did not commit the acts with which he was charged.[4]

---

[4] In addition, State Trooper Jay Gaughan, who was assigned to investigate the case, testified that the defendant denied S's allegations when he questioned the defendant about them during the course of his investigation.

"On November 12, 1997, the jury returned a verdict of guilty on both counts. The court sentenced the defendant to a total effective sentence of eight years imprisonment, suspended after four years, and ten years probation." *State* v. *Grenier*, supra, 55 Conn. App. 632–33.

The defendant appealed from the judgment of the trial court to the Appellate Court, claiming, inter alia, that the trial court improperly had permitted two of the state's witnesses, Herwerth and McGeehan, to testify regarding their belief that S's accusations against the defendant were credible.[5] The Appellate Court agreed with the defendant that the challenged testimony had been improperly admitted, but concluded that the error was harmless. Id., 641, 643. On appeal to this court, the defendant renews his claim that the trial court improperly permitted Herwerth and McGeehan to testify regarding S's credibility and maintains that the admission of the improper testimony constituted harmful error. We agree with the defendant.[6]

The following additional relevant facts are set forth in the opinion of the Appellate Court. "On direct examination by the state, Herwerth testified that she was a certified child counselor, advocate and interviewer who specialized in child sexual abuse. Herwerth stated that

---

[5] On appeal to the Appellate Court, the defendant also claimed that the trial court improperly had: (1) admitted into evidence constancy of accusation testimony; (2) declined to conduct an in camera inspection of the mental health records of the victim; and (3) concluded that the evidence was sufficient to support the jury's guilty verdict. *State* v. *Grenier*, supra, 55 Conn. App. 631. These claims, which were rejected by the Appellate Court; id., 647, 651, 655; are not the subject of this certified appeal.

[6] The defendant also claims that two other statements, one by Herwerth and one by McGeehan, also were improperly admitted, notwithstanding the defendant's failure to object to that testimony. In light of our conclusion that the defendant is entitled to a new trial on the basis of the improperly admitted expert testimony to which the defendant did object, we do not address the defendant's unpreserved claims.

she had received extensive training in the areas of child sexual abuse, interviewing techniques and child development issues. She further testified that she had treated more than 900 children who complained of being victims of sexual assault or abuse.

"During her testimony, Herwerth explained the nature of her relationship with S. In response to the state's question whether S had provided her with any details regarding the sexual assault, Herwerth testified that S had [provided details] and that '[her] statements were very credible.' The defendant's objection to this testimony was overruled.[7] . . .

---

[7] The following is a colloquy between John Gravalec-Pannone, the assistant state's attorney, and Herwerth, and the ensuing objection by John Cocheo, defense counsel:

"[Assistant State's Attorney]: . . . Now, Ms. Herwerth, have you had occasion to meet with a child named [S]?

"[Herwerth]: Yes.

"[Assistant State's Attorney]: Okay. And was [S] referred to you?

"[Herwerth]: Yes, she was.

"[Assistant State's Attorney]: And by whom?

"[Herwerth]: Her school guidance counselor.

"[Assistant State's Attorney]: Okay. And approximately what time frame are we talking about? When did this referral take place?

"[Herwerth]: February of [1996].

"[Assistant State's Attorney]: And what was the basis of this referral?

"[Herwerth]: Previous to February [6, 1996], her school—that week, her school counselor contacted me and had some concerns because she had seen [S] at school acting inappropriately and talking about having sex, so she was concerned about her behavior and referred her to me and referred the family to have her come in and have an assessment/interview done.

"[Assistant State's Attorney]: And how many times did you have occasion to meet with [S]?

"[Herwerth]: I believe it was four or five.

"[Assistant State's Attorney]: Okay. And where did these meetings take place?

"[Herwerth]: At my office in Willimantic.

"[Assistant State's Attorney]: Okay. And how long were these sessions?

"[Herwerth]: They generally ran anywhere between forty and fifty minutes, usually no later than that.

"[Assistant State's Attorney]: Okay. And who was present during these sessions?

"[Herwerth]: It was just [S] and myself. Her parents would meet with a

"During cross-examination, after the jury was excused from the courtroom, the court reviewed the contents of a bench conference that had occurred prior to Herwerth's testimony in which defense counsel had stated that he would 'object to [expert] testimony on the basis of credibility and ultimate issue.' Thereafter, [the defendant] moved to strike all of Herwerth's testimony and requested a curative instruction on the ground that her testimony that '[S's] statements were very credible' went to the ultimate issue and usurped the fact finder's function. The court denied the defendant's motion to strike, but directed the parties to draft proposed curative instructions. The defendant failed to provide the court with a proposed instruction as requested.

"The next expert witness to testify for the state was McGeehan. McGeehan testified that she was a licensed clinical psychologist who specialized in working with

counselor who work[s] with the adults at the same time.

"[Assistant State's Attorney]: Okay. And what type of interviewing techniques were you using with [S]?

"[Herwerth]: I've been trained to do—it's considered a cognitive interview. It's basically to elicit facts. It's fact-finding, it's not therapeutic. It's an interview that is nonleading and it's objective questioning.

"[Assistant State's Attorney]: And did [S] tell you that she had been the victim of a sexual assault?

"[Herwerth]: Yes. [S] told me that she had had sex.

"[Assistant State's Attorney]: And did she indicate who had done that to her?

"[Herwerth]: Yes.

"[Assistant State's Attorney]: Who was that?

"[Herwerth]: She told me her Uncle David [the defendant].

"[Assistant State's Attorney]: Okay. And did she provide you with any details regarding this alleged sexual assault?

"[Herwerth]: Yes. [*S's*] *statements were very credible.* She used a lot of sensory detail.

"[Defense Counsel]: Objection, Your Honor. My objection follows up on my—

"The Court: All right. I'm going to allow it.

"[Defense Counsel]: May I have an exception please, Your Honor?

"The Court: Exception is noted." (Emphasis added.)

children who have been sexually abused. McGeehan stated that she had treated approximately 200 children who complained of being the victims of sexual assault or abuse.

"During her testimony, McGeehan described the different types of behavioral characteristics often exhibited by children who complain of being the victims of sexual abuse. . . . [T]he state [thereafter] asked McGeehan what she was treating S for, [and] McGeehan responded that she was treating S for, inter alia, 'the trauma of the abuse that she experienced.' The defendant's objection to this testimony was overruled."[8] Id., 634–36.

At the conclusion of the trial, the trial court instructed the jury as follows, notwithstanding its decision to overrule defense counsel's objections to the testimony of Herwerth and McGeehan: "Critical to your decision in

---

[8] The following is a colloquy between John Gravalec-Pannone, the assistant state's attorney, and McGeehan, and the ensuing objection by John Cocheo, defense counsel:

"[Assistant State's Attorney]: . . . [W]hen did you start seeing [S]?

"[McGeehan]: In April of 1996.

"[Assistant State's Attorney]: And to this [day] . . . do you continue to treat [S]?

"[McGeehan]: Yes, I do.

"[Assistant State's Attorney]: And from the first time you saw her until today, approximately how may sessions have you had with [S]?

"[McGeehan]: Approximately twenty-five sessions.

"[Assistant State's Attorney]: Okay. And what are you treating [S] for?

"[McGeehan]: It's a combination of her inappropriate behavior which continues today. It has to do with sexual acting out with other children, comments of a sexual nature and also *to treat the trauma of the abuse that she experienced.*

"[Defense Counsel]: Your Honor, I'm going to object to that as conclusory and I make my same objection that I made with reference to Ms. Herwerth that—

"The Court: Overruled.

"[Defense Counsel]: The direction of this testimony is going to—

"The Court: Overruled.

"[Defense Counsel]: Thank you. Exception, please." (Emphasis added.)

this case is the testimony of [S]. In order for you to convict the defendant, you must find her testimony is credible standing alone or when coupled with other evidence in this case is established—is sufficient to establish that the defendant is guilty beyond a reasonable doubt. The veracity of a witness is to be decided by the jury.

"Ordinarily, our law does not permit another witness to give an opinion on the truthfulness of still another witness and that is true in this case. So, the testimony of Herwerth [and] McGeehan . . . was not presented so [either] of them could tell you her opinion of [S's] truthfulness. To the extent [that either] one of the . . . witnesses may have expressed her own opinion of [S's] truthfulness, you must not consider that opinion in coming to your decision. However, the testimony of these . . . witnesses was presented to you in order to furnish you with guidance on . . . how those deemed knowledgeable in the field evaluated sexual abuse allegations made by children. Each of these . . . witnesses testified about the methods used by her and others knowledgeable in the field to evaluate the legitimacy of such complaints or accusations by children. You heard [S's] testimony and the testimony from the so-called experts on how they and others in the field would examine and analyze what [S] had said to determine [S's] truthfulness regarding the accusations made in this case. You may use or not use it—that's entirely up to you—what the experts have said in deciding whether or not you believe [S's] testimony."[9]

The state agrees with the defendant that the Appellate Court properly concluded that the trial court had abused its discretion by allowing the state to elicit the

[9] The trial court previously had instructed the jury regarding its role as the fact finder and the arbiter of witness credibility. The court also instructed the jury on the role of experts generally.

challenged testimony. See *State* v. *Grenier*, supra, 55 Conn. App. 641, 643. We repeatedly have stated that an expert may not testify regarding the credibility of a particular victim. See, e.g., *State* v. *Ali*, 233 Conn. 403, 432, 660 A.2d 337 (1995); *State* v. *Freeney*, 228 Conn. 582, 592, 637 A.2d 1088 (1994); *State* v. *Borrelli*, 227 Conn. 153, 173–74, 629 A.2d 1105 (1993). Thus, we have recognized the "critical distinction between admissible expert testimony on general or typical behavior[al] patterns of minor victims and inadmissible testimony directly concerning the particular victim's credibility." *State* v. *Spigarolo*, 210 Conn. 359, 379, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989). As the Appellate Court concluded, the statements of Herwerth and McGeehan reflected their view that S was telling the truth when she testified that the defendant had abused her sexually. See *State* v. *Grenier*, supra, 640, 641–42. The Appellate Court correctly characterized Herwerth's testimony that " '[S's] statements were very credible' "; id., 640; as "a direct assertion that validated the truthfulness of S's testimony." Id., 641. With respect to McGeehan's statement that her treatment of S was for " 'the trauma of the abuse that [she] experienced' "; id., 641–42; the Appellate Court agreed that that testimony constituted "an indirect assertion that validated the truthfulness of S's testimony." Id., 642. The Appellate Court further noted that, although McGeehan's "testimony was not a literal statement of her belief in S's truthfulness, such testimony had the same substantive import and could be perceived as a conclusive opinion that S had testified truthfully." Id., 642–43. Thus, the testimony of Herwerth and McGeehan, to which the defendant timely objected, was improper and should have been stricken.

The remaining question, therefore, is whether the testimony was harmful. Because the evidentiary impropriety is not constitutional in nature, the defendant

bears the burden of demonstrating harm. E.g., *State* v. *Marshall*, 246 Conn. 799, 812, 717 A.2d 1224 (1998). "As we recently have noted, we have not been fully consistent in our articulation of the standard for establishing harm. *State* v. *Shabazz*, 246 Conn. 746, 759, 719 A.2d 440 (1998), cert. denied, 525 U.S. 1179, 119 S. Ct. 1116, 143 L. Ed. 2d 111 (1999). One line of cases states that the defendant must establish that it is more probable than not that the erroneous action of the court affected the result. . . . [E.g.] *State* v. *McIntyre*, 242 Conn. 318, 329, 699 A.2d 911 (1997); *State* v. *Wilkes*, 236 Conn. 176, 188, 671 A.2d 1296 (1996) . . . . A second line of cases indicates that the defendant must show that the prejudice resulting from the impropriety was so substantial as to undermine confidence in the fairness of the verdict. See, e.g., *State* v. *Askew*, 245 Conn. 351, 371–72, 716 A.2d 36 (1998)." (Citations omitted; internal quotation marks omitted.) *State* v. *Marshall*, supra, 812. For purposes of the present case, we need not choose between the two formulations or determine whether there is any functional difference between them because we conclude that the defendant has satisfied his burden of proving harm under either formulation of the standard. See id.

First, and most important, the state's case rested entirely on S's credibility. The state neither introduced physical or medical evidence of abuse nor presented any eyewitness testimony other than that of S. The state's case consisted of S's testimony,[10] the constancy of accusation testimony of several witnesses[11] and the testimony of Herwerth and McGeehan.[12] Furthermore,

---

[10] We note that although S identified "Uncle David" (the defendant) as her assailant, she repeatedly stated that she did not see him in the courtroom even though the defendant, in fact, was present in court.

[11] Herwerth and McGeehan were two of the state's constancy of accusation witnesses.

[12] Several other witnesses appeared for the state, but none testified about the alleged sexual abuse.

the defendant testified and denied the victim's claim of abuse. The improper testimony of Herwerth and McGeehan, therefore, struck at the heart of the central—indeed, the only—issue in the case, namely, the relative credibility of S and the defendant. Moreover, the prejudice flowing from the improper testimony was compounded by the fact that *both* of the state's expert witnesses vouched for S's credibility. Finally, inasmuch as S's version of the events provided the only evidence of the defendant's guilt, the state's case was not particularly strong.

The testimony that the state properly adduced to underscore the expert qualifications of Herwerth and McGeehan and the frequency of their contact with the victim increased the likelihood that the jury would rely on their evaluations of the victim's credibility. Herwerth stated that she had broad experience and training in the area of child sexual abuse and interviewing techniques, that she, herself, had served as a trainer in those fields, that she had treated well in excess of 900 victims of sexual abuse and that she had met with the victim on four or five separate occasions. McGeehan also testified regarding her strong professional qualifications, explaining that she had earned a doctorate degree in clinical psychology and that she had treated between 150 and 200 children who had complained of sexual abuse. McGeehan further stated that she had met with the victim approximately twenty-five times. Although the state, during closing arguments, made no mention of the challenged testimony, it did focus the jury's attention on the credentials of Herwerth and McGeehan in diagnosing and treating sexually abused children and the substantial contact that they both had with the victim.[13] In view of Herwerth's and McGeehan's profes-

---

[13] For example, the assistant state's attorney remarked during closing arguments: "Herwerth and [McGeehan] said that they've treated, combined, almost 1300 children who've been in this type of situation and they were able to indicate to you all that [S] could differentiate between the truth and

sional experience and expertise, and their numerous interviews with the victim, it is reasonable to presume that the jurors likely would conclude that, if two such highly trained experts believed the victim, so should they.[14]

The state contends that the curative instruction that the trial court issued during its jury charge mitigated

---

telling a lie. And, again, as you evaluate [S's] testimony, recall the testimony of [Herwerth] and [McGeehan] . . . . You heard [Herwerth] use the terms, [S] was consistent with her sensory details, what she experienced, what she felt as the result of the sexual assault."

The assistant state's attorney also asked the jury to "match up what [S's] testimony was with the testimony of . . . Herwerth and the testimony of . . . McGeehan combined."

The assistant state's attorney further asserted: "These two women have seen [S] over the last two years. They found her consistent in her disclosures. These are people who—and again, I mean this with no disrespect: If it walks like a duck and talks like a duck, then it's got to be a duck."

[14] Mental health experts frequently play a critical role in child sexual abuse cases due, in large measure, to the tender age of the victim, the abhorrence with which jurors are likely to view the alleged crime and the fact that such abuse is seldom undertaken in the presence of witnesses. Cf. *State* v. *Wilcox*, 254 Conn. 441, 460, 758 A.2d 824 (2000). We agree, moreover, with the following observations of the Vermont Supreme Court: "Throughout the interviewing process, the mental health professional is not simply an investigator, but a sympathetic member of a helping profession and a healer. As a result of the complex and special relationship that the expert has with the victim before the case comes to trial, what the jury ends up seeing is not a 'hired gun'—the prototypical expert paid one day by a plaintiff, [the] next day by a defendant, to take different sides on controversial issues, and who may be impeached by this very quality. Rather, the jury sees a concerned therapist who has examined the child, believed her, and is probably currently engaged in her recovery process. As a result, the jury may reach the unspoken but unmistakable conclusion that the expert's recounting of the assault is the way it happened, a version often more persuasive than even that presented by the child herself. Consequently, a juror, hearing a mental health expert testify that in the course of examining the child she told a story of abuse and named her abuser, will naturally conclude that the expert placed faith in the account. Certainly, a reasonable juror would be hard pressed to conclude otherwise. . . . In short, when credibility is in issue, the risk that jurors will abdicate their responsibility to assess the victim's credibility by inferring that an examining psychologist believed the patient is too apparent to pass off as minimal." *State* v. *Wetherbee*, 156 Vt. 425, 434–37, 594 A.2d 390 (1991). It, therefore, is especially important in child sexual abuse cases

any harm that otherwise might have resulted from the improper testimony. We acknowledge that, as a general matter, the jury is presumed to follow the court's curative instructions in the absence of some indication to the contrary. See, e.g., *State* v. *Velasco*, 253 Conn. 210, 246, 751 A.2d 800 (2000); *State* v. *McIntyre*, 250 Conn. 526, 533, 737 A.2d 392 (1999). In the present case, however, the court did not give a curative instruction immediately following the improper testimony. Rather, the court, in the presence of the jury, *overruled* the defendant's contemporaneous objections to that testimony. Therefore, the jurors not only heard the highly damaging testimony, but also had no reason to believe that it was improper until after the close of evidence and closing arguments of counsel. By that late stage of the proceedings, it is reasonable to assume that the testimony already had made a substantial, and probably indelible, impression on the jury. To whatever extent the harm created by the improper testimony might have been mitigated by an immediate and forceful admonition by the court directing the jury to disregard the testimony, it is not likely that the prejudicial effect of the testimony was reduced significantly, if at all, by the court's untimely instruction.[15]

---

that the trial court remain committed to ensuring that the jury is not tainted by improper expert testimony regarding the credibility of the child victim.

[15] In rejecting the defendant's claim, the Appellate Court noted that, because the improper testimony regarding S's credibility was not prompted by questions specifically designed to elicit such testimony, "the validating effect that [the] statements might have had on S's credibility was limited." *State* v. *Grenier*, supra, 55 Conn. App. 644. We agree with the Appellate Court that the questions posed by the state were not designed to elicit the responses that they did. We disagree, however, that the form of those questions has any substantial bearing on the extent or degree of the prejudice that flowed from the answers. Our resolution of the defendant's claim does not depend on the precise context in which the improper testimony was given, but, rather, the substance of that testimony. It is undisputed that the statements constituted inadmissible opinion evidence regarding the credibility of the state's only eyewitness.

Furthermore, because the trial court overruled the defendant's objections to the challenged testimony in the jury's presence, the curative instruction conflicted with the court's own rulings upholding the admissibility of the testimony. In light of the inconsistency between the court's rulings admitting the testimony and the court's general instruction indicating that testimony of that sort is not appropriate for consideration by the jury, it is difficult to see how the instruction would have had its intended curative effect. Indeed, in the improbable event that the instruction had any effect on the jurors, it most likely would have been to create confusion regarding the manner in which they were to treat the improper testimony.[16]

Although "[w]e have always given great weight to curative instructions in assessing claimed errors"; (internal quotation marks omitted) *State* v. *Robertson*, 254 Conn. 739, 773, 760 A.2d 82 (2000); we also "have recognized that a curative instruction is not inevitably sufficient to overcome the prejudicial impact of [inadmissible] evidence . . . ." (Internal quotation marks omitted.) *State* v. *McIntyre*, supra, 250 Conn. 535; accord *State* v. *Girolamo*, 197 Conn. 201, 208, 496 A.2d 948 (1985); *State* v. *Binet*, 192 Conn. 618, 633, 473 A.2d 1200 (1984). In light of the circumstances under which

---

[16] We note, moreover, that the curative instruction was not as clear as it could have been. Although the court did explain that the jury should not consider any opinion testimony on S's credibility, the court thereafter stated: "You heard [S's] testimony and the testimony from the so-called experts on how they and others in the field would examine and analyze what [S] had said to determine [S's] truthfulness regarding accusations made in this case. You may use or not use it—that's entirely up to you—what the experts have said in deciding whether or not you believe [S's] testimony." These two sentences are not helpful insofar as they may be construed as underscoring the link between S's credibility and Herwerth's and McGeehan's improper testimony regarding S's credibility. Furthermore, the jury reasonably could have construed the last sentence of the instruction as approval for it to consider the improper testimony in assessing S's credibility. The defendant, however, did not object to the curative instruction as given.

the curative instruction was given in this case, and inasmuch as the state's case was predicated entirely on S's version of the events, we are not persuaded that the trial court's curative instruction was adequate to ameliorate the substantial prejudice that necessarily resulted from the inadmissible testimony of Herwerth and McGeehan vouching for S's credibility. We conclude, therefore, that the defendant is entitled to a new trial.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of the trial court and to remand the case to that court for a new trial.

In this opinion the other justices concurred.