## STATE OF CONNECTICUT *v.* ROBERT DEARING
(AC 33015)

Lavine, Bear and Bishop, Js.

---

Argued October 27, 2011—officially released January 31, 2012

*Auden Grogins*, special public defender, for the appellant (defendant).

*Nancy L. Chupak*, senior assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Amy Sedensky*, senior assistant state's attorney, for the appellee (state).

BEAR, J. The defendant, Robert Dearing, appeals from the judgment of conviction, rendered after a jury trial, of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2) and risk of injury to a child in violation of General Statutes § 53-21 (a) (2). On appeal, the defendant claims that (1) the court abused its discretion and violated his constitutional rights by finding that the victim was competent to testify, (2) the court abused its discretion in allowing the state to pose a hypothetical question to its expert witness because the question went to the ultimate issue in the case and (3) the prosecutor committed improprieties during trial and closing argument. We affirm the judgment of conviction.

The following facts, which reasonably could have been found by the jury, and procedural history are relevant to our analysis. The defendant was born in 1978. The victim[1] was born in 2000; she suffers from pervasive developmental disorder not otherwise specified.[2] The

---

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[2] "Pervasive developmental disorder" is defined as "[a]ny of a group of disorders of infancy, childhood, or adolescence that are characterized by distortions in the development of the basic psychological functions such as language, social skills, attention, perception, reality testing, and movement." American Heritage Stedman's Medical Dictionary (2001) p. 627.

According to the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th Ed. Text Rev. 2000): "[The] category ['pervasive developmental disorder not otherwise specified'] should be used when there is a severe and pervasive impairment in the development of reciprocal social interaction associated with impairment in either verbal or nonverbal communication skills or with the presence of stereotyped behavior, interests, and activities, but the criteria are not met for a specific Perva-

parents of the victim, who have lived together for between eleven and thirteen years but who are not married, and the defendant were longtime intimate friends, and the victim's father frequently went to the defendant's home on weekends to work on automobiles with the defendant.[3] The victim referred to the defendant as Uncle Rob, although there was no familial relationship between them. Often, the victim accompanied her father to the home of the defendant, where she sat in the living room watching television while her father and the defendant worked on automobiles in the garage, which adjoined the living room. The father frequently would go to an auto parts store or to a convenience store while the defendant ostensibly remained in the garage working on the automobiles, and the father would leave the victim at the defendant's home while he drove to either store, which sometimes took more than one-half hour.

On a weekend day, early in November, 2008, the victim and her father again were at the defendant's home, and the father left to go to a convenience store to purchase drinks. When the father returned, the defendant was in the living room sitting on the couch with the victim. The defendant proceeded to tell the father that the victim had had "an accident" and that he had

---

sive Developmental Disorder, Schizophrenia, Schizotypal Personality Disorder, or Avoidant Personality Disorder. For example, this category includes 'atypical autism'—presentations that do not meet the criteria for Autistic Disorder because of late age at onset, atypical symptomatology, or subthreshold symptomatology, or all of these." (Emphasis omitted.) Id., p. 84.

[3] The victim's mother specifically testified that she had known the defendant for approximately twelve years and that they had maintained a sexual relationship for ten of those twelve years. She also testified that the father was aware of the relationship, that he also was involved in it and that the three of them had sexual relations in the garage at the defendant's home, sometimes while the victim was in the adjoining living room. The mother admitted that she did not tell the police or anyone involved in the investigation about this relationship, which she said ended when the victim made allegations against the defendant.

taken care of it. The victim appeared to be somewhat upset. The father recalled that the victim had not soiled herself since she was three or four years old and that she only needed help on occasion with her belt or her buttons when using the bathroom.

On Friday, November 14, 2008, the victim's mother was preparing the victim for a nap when the mother discovered the victim touching her genitals. After asking the victim some questions, the mother became concerned. On Monday, the mother contacted the victim's clinician, Natasha Jackson, who met with the mother on Tuesday and urged her to tell the father about her conversation with the victim. Later that night, the mother told the father that the victim had made allegations of sexual abuse against the defendant. On Thursday, November 20, 2008, the father and the mother took the victim to the Waterbury police department to file a complaint. The family spoke with a police officer, who gave them a card containing the names of two detectives and said that one of those detectives would contact them. After being contacted via telephone by Officer Cathleen Knapp, the mother and Knapp met at the family home on the day before Thanksgiving. An employee from the department of children and families (department), Sheila Negron, accompanied Knapp to that meeting. Knapp learned that when the mother was putting the victim down for a nap, the victim revealed that the defendant had told the victim that her private parts were dirty and needed to be cleaned and that the defendant then "cleaned" her private parts using his private parts. The mother told Knapp that the victim pointed to her vaginal and anal areas when explaining what the defendant had done. After speaking with the mother, Knapp and Negron also spoke with the victim, who reported to them that the defendant had done a "no-no" and that after telling her that she was dirty and

that he had to clean her, the defendant then "cleaned" her private parts using his private parts.

Approximately one week later, on December 1, 2008, the victim was taken to Wellpath, Inc.,[4] where Jessica Alejandro, a clinical child interview specialist, conducted a forensic interview. The interview was observed by Knapp and Negron. During the interview, the victim stated that the defendant pulls her pants down and always cleans her privates with his privates. Further, using anatomical dolls, the victim demonstrated that the defendant cleans her by putting his penis into her vagina and into her anus. She also stated that he cleans her on the inside of her private not the outside. The victim commented, while looking at a drawing of a male, that the defendant's private looks different from the drawing in that his private is big. She told Alejandro that the defendant did these things in the bathroom and while she was lying on the couch. She also stated that the defendant "didn't want [her] to look at his privates." When asked how it felt when the defendant cleaned her privates, the victim stated that when he cleaned the front of her private it felt okay, but when he cleaned her butt, it hurt. She also described that "pee" comes out of the defendant's penis when he cleans her and that he wipes up the "pee" with a sponge. The victim further stated that no one else has ever tried to clean her privates in the same manner as the defendant.[5]

On December 3, 2008, the police interviewed the defendant, advised him of his rights, applied for and

---

[4] In 2011, Wellpath, Inc., merged with Morris Foundation. The new organization is known as Wellmore Behavioral Health.

[5] On January 2, 2009, the victim was taken to Yale-New Haven Hospital, where pediatric nurse practitioner Janet Murphy, who also is the associate medical director of the Child Sexual Abuse Evaluation Clinic, performed a medical examination of the victim. Murphy reported that the victim's medical examination was normal and that her examination neither confirmed nor refuted the allegations of sexual abuse. She further explained that a lack of physical injury did not mean that something did not happen to the victim.

were issued an arrest warrant, and ultimately arrested the defendant that same night. The defendant was charged with sexual assault in the first degree and risk of injury to a child. He was tried before a jury, found guilty on both counts and sentenced to a total effective term of thirty years incarceration, execution suspended after twenty years, with fifteen years the mandatory minimum, and twenty years probation. This appeal followed. Additional facts will be set forth where necessary.

I

On appeal, the defendant first claims that the court abused its discretion in finding that the victim was competent to testify. He further claims that the court, by refusing to find that the victim was not competent to testify, violated his due process right to confront the witness against him and his sixth amendment right to present a defense. He argues that the victim largely was unable to respond during both direct and cross-examination and that she was "unable to narrate the facts of her complaint or [to] distinguish between telling the truth and telling a lie." He contends that her inability to narrate and comprehend the facts is demonstrated by her repeated contradictory testimony, her repeated failure to give verbal responses to questions and her inability to make an in-court identification of the defendant after three attempts. The defendant further contends that the victim's inability to distinguish between telling the truth and telling a lie is evinced, in part, by her specific answer to the question "what happens if you tell a lie?" to which she responded, "[i]t will be— it I'll be true."[6] We are not persuaded.

---

[6] The defendant, in at least one portion of his brief, misquotes the victim as saying " 'It will be—It ill be true.' " He also used this language during oral argument before this court, attempting to emphasize that it appeared that the victim was saying it will be true. We note, however, that the actual response, as reflected in the transcript, was "[i]t will be—it *I'll be true*." (Emphasis added.) The state argued during oral argument that, in its opinion, the victim was saying she would be true, i.e., truthful.

General Statutes § 54-86h provides: "No witness shall be automatically adjudged incompetent to testify because of age and *any child who is a victim of assault, sexual assault or abuse shall be competent to testify without prior qualification.* The weight to be given the evidence and the credibility of the witness shall be for the determination of the trier of fact." (Emphasis added.) Because "[o]ur courts have . . . [the] authority to exclude evidence that may be more prejudicial than probative [however] . . . if a child sexual assault victim could only babble or could present no useful evidence, [his or her] testimony could hardly be deemed relevant or probative." (Citations omitted.) *State* v. *James*, 211 Conn. 555, 564–65, 560 A.2d 426 (1989); see also *State* v. *Bronson*, 258 Conn. 42, 53–54, 779 A.2d 95 (2001). Few people, however, inherently are incapable of testifying in some useful manner. *State* v. *James*, supra, 563. "Many witnesses, not only children, have difficulty in remembering events, understanding questions, and expressing themselves clearly, disabilities that often raise problems for the cross-examiner. . . . Inconsistencies in testimony and witness credibility [however] are matters that are within the exclusive purview of the jury to resolve at trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Aponte*, 249 Conn. 735, 756, 738 A.2d 117 (1999), citing *State* v. *James*, supra, 564–65, and *State* v. *Smith*, 46 Conn. App. 600, 608, 700 A.2d 91, cert. denied, 243 Conn. 935, 702 A.2d 642 (1997).

In *James*, "[o]ur Supreme Court, reject[ed] a challenge to the constitutionality of § 54-86h [and] discussed with approval 'the modern trend [toward] the treatment of competency as simply one aspect of the credibility of a witness.' *State* v. *James*, [supra, 211 Conn. 563]. The court found favorable similarities between § 54-86h and evidentiary provisions in federal

law [specifically rule 601 of the Federal Rules of Evidence][7] as well as 'the philosophy that few persons are inherently incapable of testifying in a useful manner.' . . . The court also emphasized that admitting such evidence did not necessarily require the trier of fact to accept it as compelling evidence of any disputed material fact." (Citation omitted.) *State* v. *Stephen O.*, 106 Conn. App. 717, 727, 943 A.2d 477, cert. denied, 287 Conn. 916, 951 A.2d 568 (2008).

In *State* v. *Aponte*, supra, 249 Conn. 757–58, quoting in part *State* v. *Weinberg*, 215 Conn. 231, 242–44, 575 A.2d 1003, cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990), our Supreme Court later explained that "[i]n determining the competency of a proposed witness the trial court should consider the capacity of the witness to receive correct sense impressions, to comprehend the facts to be developed, to recollect and narrate facts intelligently, and to appreciate the moral duty to tell the truth. . . . The court . . . looked to the federal courts for guidance in how to measure the capacity required for a determination of competency. Relying on rule 601 of the Federal Rules of Evidence, we concluded that a trial court maintains the obligation to ensure that a witness' testimony meets the minimum standard of credibility necessary to permit a reasonable person to put any credence in that testimony. . . . In making this determination the court will still be deciding competency. It would, however . . . be more accurate to say that the court will decide . . . minimum credibility. This requirement of minimum credibility is just one aspect of the requirement of minimum probative force—i.e., relevancy. Regardless of terminology, the trial judge may exclude all or a part of the witness' testimony on the ground that no one could reasonably

---

[7] Rule 601 of the Federal Rules of Evidence provides in relevant part: "Every person is competent to be a witness except as otherwise provided in these rules. . . ."

believe the witness could have observed, remembered, communicated or told the truth with respect to the event in question. . . . Finally . . . rule 601, as applied by the federal courts, establishes a reasoned approach to determining the admissibility of a witness' testimony and adopted the rule that where the competency of a witness is challenged, the threshold question to be answered by the court is whether the testimony of that witness is minimally credible. If the testimony of a witness passes the test of minimum credibility, and is otherwise relevant, the testimony is admissible and the weight to be accorded it, in light of the witness' incapacity, is a question for the trier of fact. . . . [T]he competency of a witness is a matter peculiarly within the discretion of the trial court and its ruling will be disturbed only in a clear case of abuse or of some error in law." (Citation omitted; internal quotation marks omitted.)

Reviewing the testimony of the victim within this framework, we conclude that the trial court did not abuse its discretion in concluding that the defendant had failed to prove that the victim was not competent to testify at trial. The defendant raises as an issue on appeal the victim's lack of verbal responses, inconsistent testimony and inability to identify the defendant at trial. The jury, however, was present during her testimony and observed her responses including, but not limited to, her inability, three times during trial, to identify the defendant. We do not agree that the victim's responses, or lack thereof at times, indicate an inability to comprehend the situation or to offer meaningful or relevant testimony. In this case, the victim was a nine year old child with developmental delays, whom the court recognized as nervous while she was in the courtroom. A review of her trial testimony reveals considerable relevant testimony. She testified that she knew she was there to talk about the defendant. She testified that

the defendant did a "no-no" to her, that she often went to the defendant's home with her father, that she watched television when she went to the defendant's home, and that she no longer goes to the defendant's home because he "cleaned this part and this part," while pointing to her vaginal and buttocks areas. When presented with male and female anatomical dolls, the victim correctly demonstrated that she knew the difference between the two. When asked to demonstrate on the dolls the positioning of her clothes and the defendant's clothes at the time the defendant touched her, the victim pulled down the undergarments of each doll to expose their genitals. She then demonstrated with the dolls how the defendant placed his penis inside her vagina and moved back and forth. She likewise demonstrated the penis of the male doll touching the buttocks of the female doll. The victim also stated that the defendant touched the inside of her vagina and her buttocks. Although the defendant makes much of the fact that some of the victim's testimony was inconsistent and that she was unable or very hesitant to answer many of the questions posed, such facts do not equate to an inability to understand the proceedings or to offer relevant testimony; rather, such facts provide fodder for cross-examination and are appropriate for the consideration of the jury when assessing credibility. See *State* v. *Aponte,* supra, 249 Conn. 756; *State* v. *James,* supra, 211 Conn. 564–65.

The defendant also argues that the victim was "incapable of understanding the distinction between telling the truth and a lie and did not comprehend the moral duty to tell the truth." As support for this argument, the defendant points to the victim's answer when asked what happens when you tell a lie, to which, the defendant states, she responded that it "would make it true." He also points to the victim's response to a follow-up

question that the defendant argues indicates that she did not know that she could not lie. We are not persuaded.

In this case, the victim twice was administered an oath, and she agreed to tell the truth. See Practice Book § 32a-4 (a). Although the defendant argues that the victim stated that if she told a lie, it would make it true, a review of the transcript reveals something different. The court specifically asked the victim: "Okay. Now, do you know the difference between telling a lie and telling the truth?" To which the victim responded: "Yes." The court quickly followed up by asking: "All right. And what happens if you tell a lie?" To which the victim responded: "It will be—it *I'll be true*."[8] (Emphasis added.) A short time later, the court asked the victim if she understood that she could not lie, to which she responded: "No." The court then found: "Given her responses and her expressions, if you will, accompany[ing] the responses, which obviously the record doesn't pick up, but in particular the emphasis when I inquired if she understands that she cannot lie," she understood the obligation to be truthful.

After closely reviewing the victim's testimony and the findings of the court, which were made after its observation of the victim and which specifically discussed the victim's demeanor during questioning, we conclude that the court did not abuse its discretion in denying the defendant's oral motions to find the victim incompetent to testify.

II

The defendant next claims that the court abused its discretion in overruling his objection and in allowing the prosecutor to pose a hypothetical question to the state's expert witness, Diane Edell, a forensic interviewer, on redirect because it elicited an answer that

[8] See footnote 6 of this opinion.

went to the ultimate issue in the case, namely, the credibility of the victim. He contends that this issue raises a question of constitutional dimension. The state argues that this claim is not of constitutional dimension and that the court properly permitted the hypothetical question because the question itself did not seek to elicit an opinion on the ultimate issue in the case. The state also argues that insofar as the defendant raises an issue regarding the propriety of Edell's answer, that issue was not preserved at trial because the defendant objected only to the question posed and not to the answer it elicited, which, arguably may have gone beyond the scope of the question. Additionally, the state argues that, even if we review this evidentiary issue regarding Edell's answer, her answer cannot be read as a comment on the ultimate issue in the case. We conclude that the defendant's claim is not of constitutional dimension, that the issue regarding the propriety of the question was preserved properly and that the court did not abuse its discretion in overruling the defendant's objection to the question. We further conclude that any issue regarding the propriety of Edell's answer to the hypothetical question was not preserved and thus is not properly before us for review in the defendant's appeal.

"Generally, the admissibility of evidence is a matter of state law and unless there is a resultant denial of fundamental fairness or the denial of a specific constitutional right, no constitutional issue is involved." (Internal quotation marks omitted.) *State* v. *Vilalastra*, 207 Conn. 35, 46, 540 A.2d 42 (1988). In *Vilalastra*, the court noted that the defendant had not cited "a single case from any jurisdiction in which a court has held that the erroneous admission of expert testimony concerning an ultimate fact implicates fundamental fairness or constitutes the violation of a specific constitutional right."

Id., 46–47. It explained that "[c]ourts in other jurisdictions have not attached constitutional significance to this type of evidentiary error." Id., 47; see also *State* v. *Grenier*, 257 Conn. 797, 806–807, 778 A.2d 159 (2001) (expert's comment on victim's credibility is evidentiary impropriety, not constitutional in nature). It is a "well established *evidentiary rule* that it is improper to ask a witness to comment on another witness' veracity . . . [and that] [a]s a matter of law, [t]he credibility of witnesses is exclusively for the determination by the jury . . . ." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Singh*, 259 Conn. 693, 706–707, 793 A.2d 226 (2002). Accordingly, we conclude that the defendant's claim is evidentiary in nature.

The defendant claims that the court abused its discretion in overruling his objection and in allowing the prosecutor to pose a hypothetical question to Edell. The following additional facts are relevant. During the state's redirect examination of Edell, the following colloquy occurred:

"[The Prosecutor]: Now, I'd like to give you a hypothetical. I'm going to ask you a hypothetical question. If you could please assume the following facts, that a child is present in a forensic interview, that she is eight years of age and does have developmental delays, and through the course of the interview the child does disclose that a family friend had sexually abused her. And the abuse was penile/vaginal and penile/anal intercourse. And that that child during the interview when asked by the interviewer how it felt indicates that the vaginal intercourse felt okay. When asked about anal intercourse the child indicates, oh, no it hurt. And, actually, the child then goes and holds her bottom as she's saying that. And further on in the interview when asked if anything came out of the family friend's, the male's penis, the child indicated pee-pee and that the family friend had to wipe it out with a sponge.

"Can you tell us based on your training and experience if there's any significance to any of those factors?

"[Defense Counsel]: Objection, Your Honor. That question sounds like it's going to elicit an opinion as to the ultimate issues in this case.

"[The Prosecutor]: Your Honor, it's a hypothetical question. She's already—Ms. Edell has already talked about the sensory details and counsel repeatedly asked her about the reliability of interviewers and whether or not just based on a child's interview if one could tell if they're telling the truth, and Ms. Edell answered— her answer was, you have to look at these factors.

"[The Court]: The objection is overruled to the extent that the question pending was whether or not it had any significance and I think everyone is aware of what's allowed and what is not allowed. So to the extent that that was the question, did it have any significance, the objection is overruled.

"[Edell]: The things that stand out for me from that are that the child was—if the child was eight years old, the child should not be expected to know about either intercourse or anal penetration, so there is inappropriate sexual knowledge. The fact that she made a distinction between the front and the back . . . also goes to reliability and that it just gives a little more credibility to the fact that their—that she experienced them rather than somebody told her to say that that happened.

"The, again, the level of detail in terms of something coming out of the penis, again, is inappropriate sexual knowledge for a child, not something necessarily that somebody would know we were going to ask about. Having the detail of what the person did with whatever came out is, again, just detail of the sexual act that we do look for."

Our Supreme Court has recognized that "when credibility is in issue, the risk that jurors will abdicate their responsibility to assess the victim's credibility by inferring that an examining psychologist believed the patient is too apparent to pass off as minimal. . . . It, therefore, is especially important in child sexual abuse cases that the trial court remain committed to ensuring that the jury is not tainted by improper expert testimony regarding the credibility of the child victim." (Citation omitted; internal quotation marks omitted.) *State* v. *Grenier*, supra, 257 Conn. 809–10 n.14. "In cases that involve allegations of sexual abuse of children, our Supreme Court has held that expert testimony of reactions and behaviors common to victims of sexual abuse is admissible. . . . Such evidence assists a jury in its determination of the victim's credibility by explaining the typical consequences of the trauma of sexual abuse on a child. . . . It is not permissible, however, for an expert to testify further to her opinion of whether a victim in a particular case is credible or that a particular victim's claims are truthful." (Citations omitted; internal quotation marks omitted.) *State* v. *Grenier*, 55 Conn. App. 630, 640, 739 A.2d 751 (1999), rev'd on other grounds, 257 Conn. 797, 778 A.2d 159 (2001).

The defendant argues that Edell's testimony went to the ultimate issue in this case, namely, the victim's credibility, and that it amounted to a constitutional violation. He alleges that the court improperly overruled his objection to the state's purported hypothetical because it sought to elicit this improper response. The state, on the other hand, argues that the question posed was not improper and that the defendant never objected to the answer given by Edell, which, arguably, may have gone beyond the scope of the question. The state further contends that because the defendant failed to object to the answer given, the claim is not preserved. We agree that the question posed, in and of itself, did not

seek to elicit an opinion of the victim's credibility. We also agree that any claim regarding the propriety of Edell's answer was not preserved and, therefore, is not reviewable.

A thorough review of the hypothetical posed by the prosecutor reveals that an appropriate response to the question would have been a yes or no answer. Although setting forth "hypothetical" facts that tracked the facts of this case, the prosecutor asked only whether there was any significance to any of those facts. He did not ask Edell to explain what was significant or whether there were facts that would make it more likely than not that the victim was being truthful. On the basis of the objection offered by the defendant, i.e., that the question might elicit an opinion on the ultimate issue, the court properly overruled the objection and allowed Edell to answer the specific question that was posed.

Insofar as the defendant for the first time on appeal takes issue with Edell's answer to the question, the record reveals that, although the answer may not have been directly responsive to the specific question posed by the prosecutor, the defendant failed either to object to it or move to strike it. See 1 J. Wigmore, Evidence (Rev. Ed. 1983) § 18, p. 790 ("The initiative in excluding improper evidence is left entirely to the opponent . . . . A rule of evidence not invoked is waived."). "Where a question is objected to and the objection is properly overruled but the answer that follows contains improper evidence, the objection to the question is of no avail; a new objection must be made specifically to the answer . . . ." Id., p. 835. Accordingly, we conclude that the defendant has failed to preserve this issue for review.

The defendant also asks that, if we conclude that this issue is unpreserved, we review this claim under *State v. Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

As set forth previously in this opinion, however, we conclude that the issue is evidentiary in nature. See *State* v. *Grenier*, supra, 55 Conn. App. 637–38. Therefore, it fails *Golding*'s second prong and is not subject to review by this court. "[T]he admissibility of expert testimony is a matter of state evidentiary law that, in the absence of timely objection, does not warrant appellate review under [*Golding*] . . . because it does not, per se, raise a question of constitutional significance. . . . Moreover, we have declined to attach constitutional significance to the erroneous admission of expert testimony concerning an ultimate fact." (Citations omitted; internal quotation marks omitted.) Id.

### III

The defendant's final claim is that the prosecutor committed improprieties during trial and during closing argument, which affected the defendant's ability to receive a fair trial. He explicitly points to three instances wherein he alleges that the prosecutor committed improprieties: (1) by posing an improper hypothetical question to Edell, (2) by denigrating defense counsel by suggesting that the defendant's case was just " 'smoke and mirrors' " via the use of an octopus analogy and (3) by mischaracterizing the evidence. We are not persuaded.

Before addressing the merits of the defendant's claim, we set forth the applicable legal principles and standard of review. "[A] claim of prosecutorial impropriety, even in the absence of an objection, has constitutional implications and requires a due process analysis under *State* v. *Williams*, 204 Conn. 523, 535–40, 529 A.2d 653 (1987)." *State* v. *Gould*, 290 Conn. 70, 77, 961 A.2d 975 (2009). "In analyzing claims of prosecutorial impropriety, we engage in a two step process. . . . First, we must determine whether any impropriety in fact occurred; second, we must examine whether that

impropriety, or the cumulative effect of multiple improprieties, deprived the defendant of his due process right to a fair trial." (Internal quotation marks omitted.) Id.

"[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . In determining whether such [impropriety] has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based [on] the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case." (Internal quotation marks omitted.) Id., 78–79.

If we conclude that prosecutorial impropriety has occurred, we then must apply the six factors enumerated in *State* v. *Williams*, supra, 204 Conn. 540, to determine whether the entire trial was so infected with unfairness that it deprived the defendant of his due process right to a fair trial. "These factors include the extent to which the [impropriety] was invited by defense conduct or argument, the severity of the [impropriety], the frequency of the [impropriety], the centrality of the [impropriety] to the critical issues in the case, the strength of the curative measures adopted, and the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Outing*, 298 Conn. 34, 80, 3 A.3d 1

(2010), cert. denied, 562 U.S. 1225, 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011). We address each of the alleged improprieties in turn.

The defendant first argues that the prosecutor's use of a hypothetical question to Edell, as discussed in part II of this opinion, amounted to impropriety because the prosecutor knew or should have known that it would produce a response that went to the victim's credibility. We are not persuaded. The question posed by the prosecutor, as fully explained in part II of this opinion, called for a yes or no answer, and, although Edell gave an answer that was more expansive than the question required, the defendant has pointed to nothing in the record that demonstrates that the prosecutor asked the question with the intent to elicit an improper response. Accordingly, we conclude that this argument is without merit.

The defendant next argues that the prosecutor committed impropriety when she denigrated defense counsel by suggesting that the defendant's case was just " 'smoke and mirrors' " via the use of an octopus analogy. First, we find it necessary to clarify that the prosecutor did not use the words "smoke and mirrors" in her argument, but, rather, she set forth an octopus analogy that the defendant alleges is similar to a smoke and mirrors argument.

Relying on *State* v. *Orellana*, 89 Conn. App. 71, 103, 872 A.2d 506, cert. denied, 274 Conn. 910, 876 A.2d 1202 (2005), the defendant argues that the prosecutor's octopus analogy is tantamount to an improper smoke and mirrors argument wherein the prosecutor tells the jurors that the defendant is trying to mislead and confuse them by the use of irrelevant evidence. The state responds that the use of this analogy in this case was not improper because it focused only on defense evidence and strategy, which is permissible. We conclude

that the use of the analogy in this case was not improper.

"[T]he prosecutor is expected to refrain from impugning, directly or through implication, the integrity or institutional role of defense counsel. . . . *State* v. *Orellana*, [supra, 89 Conn. App. 101]. [I]t is improper for a prosecutor to tell a jury, explicitly or implicitly, that defense counsel is employing standard tactics used in all trials, because such argument relies on facts not in evidence and has no bearing on the issue before the jury, namely, the guilt or innocence of the defendant. . . . Id., 102. There is a distinction [however] between argument that disparages the integrity or role of defense counsel and argument that disparages a theory of defense. . . . Moreover, not every use of rhetorical language is improper. . . . *State* v. *Salamon*, 287 Conn. 509, 558, 949 A.2d 1092 (2008); *State* v. *Warholic*, [278 Conn. 354, 363, 897 A.2d 569 (2006)]. There is ample room, in the heat of argument, for the prosecutor to challenge vigorously the arguments made by defense counsel. *State* v. *Orellana*, supra, 103." (Internal quotation marks omitted.) *State* v. *Outing*, supra, 298 Conn. 82–83.

The defendant argues that the following portions of the prosecutor's closing argument were improperly similar to a smoke and mirrors argument: "Now, counsel gave you a couple of stories and he talked about a bird and an elephant. I'm going to talk about an octopus for [a] moment. And just give you an analogy. [An] octopus, one of the defense mechanisms of an octopus is that it squirts out ink and clouds the water when a predator or someone comes by and then it escapes. And I'm going to ask you to, you know, kind of do an analogy here and ask yourself what evidence in this case was interjected into the case and that clouds the water, but when you really look at it, it has nothing to do with this case. It has nothing to do with judging the credibility

of witnesses or is it just an attempt to [deflect] the attention away from the child, to [deflect] the attention away from what she told Officer Knapp, what she told Ms. Negron when she was present with Officer Knapp, what she told her mother, what she told Jessica Alejandro, what she told you all here in court. Is it just an attempt to have you not consider the child and to be overwhelmed and shocked by the other evidence and perhaps you'll forget about what it was that the child told everybody?"

After reviewing the closing argument in its entirety, we are not persuaded that this argument was improper. Immediately before setting forth this octopus analogy, the prosecutor specifically tied the analogy to the evidence of the sexual relationship between the defendant, the father and the mother. She told the jury: "Now, we know there was evidence here of the consensual, sexual relationship amongst the three adults . . . . And we know that we heard evidence that the defendant and the child's mother had sexual relations, we know that the child's father was present on many occasions and actually participated as well. That type of evidence perhaps you didn't expect to hear, you didn't think you would hear, but you heard it, and, again, those are the facts in this case. But what relevance, if any, does that have in a case where an eight year old child is telling you that this defendant sexually assaulted her and she's able to give you the details of what acts this defendant perpetrated upon her?" Furthermore, immediately after setting forth the octopus analogy, the prosecutor asked the jury: "What really does this particular consensual, adult relationship have to do with the credibility of [the victim]? How does that affect her credibility? . . . So I ask you not to lose sight of why we're here and not allow this type of evidence that is used to put a cloud over the parents' head, not allow this evidence at all to play a part in your decision-making, if you think after

you all talk that it has nothing to do with the particular case. There is absolutely no evidence whatsoever that on those few occasions that the child observed anything that was going on and you're not allowed to speculate. There's absolutely no evidence whatsoever."

Here, it is clear that the prosecutor was telling the jury not to be confused by the evidence of the sexual relationship between the adults—that it had no bearing on whether the victim had been abused by the defendant. We conclude that such argument, in this context, was not improper.

The defendant also points to two other instances wherein he alleges that the prosecutor made an improper analogy during closing argument. The prosecutor argued: "I'm just going to go back a moment to that octopus and the ink and the cloudy water, and ask you, again, all this other stuff that's interjected into this case. Is it reasonable to infer it's just to get you all off the track of [the victim], to get you to deflect the attention from the fact that she can tell you that the child—excuse me—that the defendant ejaculated, that he had to wipe the semen from her body so there would be no evidence of it? To take away from the fact that the child said, anal sex hurt, to take away from the fact that this child knew what vaginal intercourse was, what anal intercourse was."

A review of the transcript reveals that immediately after this argument, the prosecutor stated: "There was some talk at some point about marijuana and the mother and the father, what does that have to do with the case? [The department] . . . Ms. Negron said there was no neglect. Why are we asking—why is the attorney asking about that? So all of these clouds that have been interjected into this case are injected to sort of cloud up what you all are seeing. You all go through it all and decide whether or not you think that it has anything to

do with the case." Again, we conclude that the prosecutor properly tied this analogy to the evidence and argued that some of the evidence had nothing to do with the defendant's assault of the victim and that the jury should not be confused by the evidence. Such argument, in this context, was not improper.

The defendant also points to the following portion of the prosecutor's closing argument: "So, all of these clouds that have been interjected into this case are injected to sort of cloud up what you all are seeing. You all go through it all and decide whether or not you think that it has anything to do with the case. And I submit to you, once all those clouds settle and you take a look at the case, this is what you're going to see." The prosecutor then played the video recording of the victim's forensic interview for the jury. Again, there is nothing improper in this argument. The prosecutor clearly told the jury that it had to look at the evidence presented, decide what was important and return a verdict after so doing. This was not improper.

The defendant's final claim of prosecutorial impropriety alleges that the prosecutor improperly mischaracterized the evidence in the case. He argues that "[d]uring closing argument, the prosecutor improperly argued to the jury, that [the victim's] late . . . reporting of this incident was due to the fact that she had been threatened [by the] defendant. This mischaracterization of the evidence was not supported by the facts produced at trial." We disagree.

"While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury ha[s] no right to consider." (Internal quotation marks omitted.) *State* v. *Rowe*, 279 Conn. 139, 159, 900 A.2d

1276 (2006). "It is well settled that a prosecutor must not comment on evidence that is not part of the record, nor is he to comment unfairly on the evidence adduced at trial so as to mislead the jury." (Internal quotation marks omitted.) *State* v. *Johnson*, 82 Conn. App. 777, 793, 848 A.2d 526 (2004).

The defendant argues that the prosecutor's statement to the jury that "[t]his defendant threatened [the victim], told her if you tell your daddy he's going to get mad at you" was not based in evidence and was improper. We disagree.

During trial, the father testified that he asked the victim what had happened with the defendant and that the victim told him that the defendant instructed her "not to say anything to her father because her father would get mad if he found out." During her forensic interview with Alejandro, the victim also told Alejandro that her father would "get really mad." Although the victim's statement to Alejandro was spontaneous and not related to any question posed by Alejandro regarding whether she had been threatened by the defendant, the victim's statement bolsters the father's testimony regarding what the victim had told him. Furthermore, although the defendant argues on appeal that the father's testimony was hearsay, this issue is not before us. The father's testimony was evidence that was before the jury, and it was proper for the prosecutor to comment on it.

Additionally, we also disagree with the defendant's argument that this could not be considered a threat. "A threat is 1. an indication of something impending and usually undesirable or unpleasant . . . 2. something that by its very nature or relation to another threatens the welfare of the latter. . . . A threat has also been defined as any menace of such a nature and extent as to unsettle the mind of the person on whom it operates,

and to take away from his acts that free and voluntary action [which] alone constitutes consent." (Internal quotation marks omitted.) *State* v. *Skidd*, 104 Conn. App. 46, 58–59, 932 A.2d 416 (2007); see *State* v. *Cook*, 287 Conn. 237, 257 n.14, 947 A.2d 307, cert. denied, 555 U.S. 970, 129 S. Ct. 464, 172 L. Ed. 2d 328 (2008). When an adult abuser warns his eight year old victim not to tell her father that he is sexually abusing her because her father will get mad, we conclude that such a warning constitutes a threat. In this case, the defendant's statements were meant to deter the victim from voluntarily revealing his continuing abuse of her by producing fear in her that her father would become angry if she revealed such information to him.

On the basis of our review of the record, we conclude that the prosecutor's remarks constituted fair comment, asking the jury to draw a reasonable inference from the evidence presented at trial. We therefore conclude that the defendant's claim that the prosecutor mischaracterized the evidence lacks merit.

The judgment is affirmed.

In this opinion the other judges concurred.